# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION (KNOXVILLE)

CIC Services, LLC,

*Plaintiff,*

v.

INTERNAL REVENUE SERVICE;
MELANIE KRAUSE, in her official capacity as
Acting Commissioner of the Internal Revenue
Service; U.S. DEPARTMENT OF TREASURY;
and UNITED STATES OF AMERICA,

*Defendants.*

Case No.  3:25-cv-146-TRM-JEM

District Judge Travis R. McDonough

Magistrate Judge Jill E. McCook

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background .................................................................................................................. 2

I.    The Tax Code promotes captive insurance for small businesses, but the IRS resists Congress's choice. ......................................................................................... 2

    A.    Captive insurance has many private and public benefits. ....................... 2

    B.    Congress creates tax benefits to promote small captives. ..................... 3

    C.    The IRS has a long history of opposing captive insurance. ................... 5

II.    After this Court invalidated the IRS's notice, the IRS replaced it with the final rule. ............... 6

III.    Like the prior notice, the final rule injures CIC Services. ................................. 8

Summary of Argument ................................................................................................. 8

Argument .................................................................................................................... 13

I.    The final rule exceeds Defendants' statutory authority. .................................. 13

    A.    The final rule adds new requirements to §831(b). .......................... 13

    B.    The final rule alters the PATH Act's diversification requirements. .............. 16

II.    The final rule is arbitrary and capricious. ....................................................... 17

    A.    The administrative record lacks facts or data to support the final rule's conclusions. ............................................................. 18

    B.    The final rule is not reasonably explained. ..................................... 20

    C.    The final rule relies on impermissible factors. ................................ 26

    D.    Defendants' abuse-detection rationale is pretext. ........................... 28

III.    CIC Services is entitled to a remedy for Defendants' APA violations. ........... 30

    A.    The final rule should be vacated. .................................................... 30

    B.    The Court should also declare the final rule invalid and enjoin Defendants from enforcing it against CIC, its clients, and its affiliates. ................... 32

Conclusion ................................................................................................................. 33

Certificate of Service ................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Acker v. Comm'r,*
258 F.2d 568 (6th Cir. 1958) ........................................................................................ 13

*Amerijet Intern. v. Pistole,*
753 F.3d 1343 (D.C. Cir. 2014) .................................................................................... 24

*Atlantic Arts Found. v. SBA,*
2023 WL 8101074 (D.D.C. Nov. 21, 2023) .................................................................. 21

*Atrium Med. Ctr. v. HHS,*
766 F.3d 560 (6th Cir. 2014) ...................................................................... 17, 20, 25

*Avrahami v. Comm'r,*
149 T.C. 144 (2017) ...................................................................................................... 22

*Billy F. Hawk, Jr. v. Comm'r,*
924 F.3d 821 (6th Cir. 2019) ........................................................................................ 15

*Brooks v. United States,*
473 F.2d 829 (6th Cir. 1973) ................................................................ 13, 14, 15, 17

*Bryant v. City of Cincinnati,*
-- F.Supp.3d --, 2025 WL 860931 (S.D. Ohio Mar. 19, 2025) .................................... 22

*CIC Services v. IRS (CIC Services II),*
592 F. Supp. 3d 677 (E.D. Tenn. 2022) ............................................................... passim

*CIC Services v. IRS (CIC Services III),*
2022 WL 2078036 (E.D. Tenn. June 2, 2022) .............................................................. 19

*CIC Services v. IRS,*
593 U.S. 209 (2021) ................................................................................................ 1, 26

*Clougherty Packing Co. v. Comm'r,*
811 F.2d 1297 (9th Cir. 1987) ...................................................................................... 24

*Clougherty Packing Co. v. Comm'r,*
84 T.C. 948 (1985) ........................................................................................................ 18

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
603 U.S. 799 (2024) ...................................................................................................... 31

*Dep't of Comm. v. New York,*
588 U.S. 752 (2019) ................................................................................ 17, 20, 28, 30

*DHS v. Regents of the Univ. of Calif.*,
  591 U.S. 1 (2020) ........................................................................................................ 25

*Dixon v. United States*,
  381 U.S. 68 (1965) ...................................................................................................... 26

*Encino Motorcars v. Navarro*,
  579 U.S. 211 (2016) .................................................................................................... 18

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ................................................................................................17, 24

*Flyers Rights Educ. Fund. v. FAA*,
  864 F.3d 738 (D.C. Cir. 2017) ........................................................................ 11, 20, 21

*GBX Assocs. v. United States*,
  2022 WL 16923886 (N.D. Ohio Nov. 14, 2022) ........................................................ 31

*Gregory v. Helvering*,
  293 U.S. 465 (1935) .................................................................................................... 15

*Helvering v. Le Gierse*,
  312 U.S. 531 (1941) .................................................................................................... 15

*Hosseini v. Nielsen*,
  911 F.3d 366 (6th Cir. 2018) ...................................................................................... 21

*Humana v. Comm'r*,
  881 F.2d 247 (6th Cir. 1989) ...................................................................................5, 24

*Jama v. ICE*,
  543 U.S. 335 (2005) ................................................................................................27, 28

*Kentucky v. EPA*,
  123 F.4th 447 (6th Cir. 2024) ..................................................................................... 30

*Kubacki v. U.S. Dep't of Agric.-Farm Serv. Agency*,
  2013 WL 4052916 (E.D. Mich. Aug. 12, 2013) ......................................................... 21

*Loper Bright Enterp. v. Raimondo*,
  603 U.S. 369 (2024) .................................................................................................... 13

*Madan B.K. v. Noem*,
  -- F.Supp.3d --, 2025 WL 1171572 (W.D. Mich. Apr. 23, 2025) ............................... 33

*Mann Constr. v. United States*,
  27 F.4th 1138 (6th Cir. 2022) ..................................................................................... 30

*Mann Constr. v. United States*,
    651 F.Supp.3d 871 (E.D. Mich. 2023).................................................................................. 30

*Mann Constr. v. United States*,
    86 F.4th 1159 (6th Cir. 2023).......................................................................................... 31

*McGowen v. United States*,
    143 F.4th 686 (6th Cir. 2025).......................................................................................... 15

*Moore v. United States*,
    602 U.S. 572 (2024).......................................................................................................... 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983)....................................................................................................17, 25

*Nat'l Cable Television Ass'n v. United States*,
    415 U.S. 336 (1974).......................................................................................................... 13

*Nat'l Life & Acc. Ins. Co. v. United States*,
    524 F.2d 559 (6th Cir. 1975)................................................................................... passim

*National Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998)...................................................................................... 30

*NPR Invs. ex rel. Roach v. United States*,
    740 F.3d 998 (5th Cir. 2014)......................................................................................8, 14

*Ohio v. Becerra*,
    87 F.4th 759 (6th Cir. 2023)............................................................................................ 32

*Ohio v. EPA*,
    603 U.S. 279 (2024).......................................................................................................... 17

*Owners Ins. v. Lyons Lumber*,
    2006 WL 905935 (E.D. Ky. Apr. 7, 2006)................................................................... 32

*Puglisi v. Comm'r*,
    2021 WL 7162530 (T.C. Oct. 29, 2021)........................................................................ 22

*R.V.I. Guarantee Co. v. Comm'r*,
    145 T.C. 209 (2015)......................................................................................... 14, 22, 23

*Rent-A-Center, Inc. v. Comm'r*,
    142 T.C. 1 (2014)........................................................................................................18, 24

*San Francisco v. EPA*,
    145 S. Ct. 704 (2025)........................................................................................................ 28

iv

*Sierra Club v. EPA,*
  60 F.4th 1008 (6th Cir. 2023) ............................................................................... 31

*Summa Holdings v. Comm'r,*
  848 F.3d 779 (6th Cir. 2017) ......................................................................... passim

*Tennessee v. Cardona,*
  762 F.Supp.3d 615 (E.D. Ky. 2025) ..................................................................... 30

*Tennessee Valley Auth. v. Jones,*
  199 F.Supp.3d 1198 (E.D. Tenn. 2016) ............................................................ 32, 33

*Trump v. CASA, Inc.,*
  145 S. Ct. 2540 (2025) ........................................................................................ 31

*U.S. Lines v. Federal Maritime Comm'n,*
  584 F.2d 519 (D.C. Cir. 1978) ............................................................................ 21

*U.S. v. Byrum,*
  408 U.S. 125 (1972) ....................................................................................... 26, 29

*United States v. Del. Dep't of Ins.,*
  66 F.4th 114 (3d Cir. 2023) .............................................................................. 2, 3

*United States v. Jacobs,*
  306 U.S. 363 (1939) ........................................................................................... 13

*Univ. of Tennessee Rsch. Found. v. Caelum Biosciences,*
  667 F.Supp.3d 734 (E.D. Tenn. 2023) ................................................................. 31

*William Powell Co. v. Nat'l Indemnity Co.,*
  18 F.4th 856 (6th Cir. 2021) ................................................................................. 3

**Statutes**

5 U.S.C. §702 ....................................................................................................... 31

5 U.S.C. §703 ....................................................................................................... 31

5 U.S.C. §706 ............................................................................................... passim

IRC §118(a) .......................................................................................................... 26

IRC §162(a) ................................................................................................... 1, 4, 26

IRC §61(a) ............................................................................................................ 26

IRC §6103(b)(2) .................................................................................................... 21

IRC §6707A ................................................................................................................... 7, 14

IRC §831(b) ................................................................................................................... passim

Tenn. Code Ann. §56-13-105 ........................................................................................ 3

Tenn. Code Ann. §56-13-108 ........................................................................................ 3

Tenn. Code Ann. §56-13-109 ........................................................................................ 3

**Legislative Materials**

JCX-144-15 (2015) ........................................................................................................ 5

JCX-21-15 (2015) ................................................................................................... 4, 5, 17

Pub. L. 114-113, 129 Stat. 3040 ................................................................................ 4, 5

Pub. L. 99-514, 100 Stat. 2085 ................................................................................... 4

S. 905, 114th Cong. (Apr. 14, 2015) ........................................................................ 5

S. Rep. No. 114-16 (2015) ............................................................................................ 4

**Regulations**

26 C.F.R. §1.6011-10 ................................................................................................. passim

26 C.F.R. §1.6011-11 ............................................................................................ 6, 7, 16

26 C.F.R. §1.6011-4 ...................................................................................................... 7

26 C.F.R. §301.6111-3 .................................................................................................. 8

**Rules**

*AJCA Modifications to the Section 6011 Regulations,*
    72 Fed. Reg. 43146 (Aug. 3, 2007) ...................................................................... 25

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest,*
    88 Fed. Reg. 21547 (Apr. 11, 2023) .............................................................. 6, 29

*Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest,*
    90 Fed. Reg. 3534 (Jan. 14, 2025) .................................................................. passim

Notice 2000-44 ............................................................................................................... 7

Notice 2016-66 ........................................................................................................... passim

Rev. Rul. 2001-31 ............................................................................................................5, 28

Rev. Rul. 77-316 ............................................................................................................5, 28

**Other Authorities**

Chang & Chen, *Characteristics of S&P 500 Companies with Captive Insurance Subsidiaries*,
    37 J. of Ins. Reg. 1 (2018) ...................................................................................... 2

Taylor & Sobel, *A Closer Look at Captive Insurance*,
    CPA J. 48 (June 2008) .............................................................................................. 2

## INTRODUCTION

Nearly all large corporations insure some of their business through a captive insurance company. As the name suggests, a captive insurance company is a subsidiary of the corporation it insures. To encourage their use, the Internal Revenue Code gives captive arrangements certain tax advantages, like letting the insured corporation deduct the cost of captive insurance under §162(a). In the 1980s, Congress added a new tax exemption, §831(b), to allow small businesses to reap the benefits of captive insurance. For small businesses, the tax savings from §831(b) offset the costs that once made captive insurance something that only large enterprises could afford.

The IRS is not fond of captive insurance, and it especially dislikes §831(b). This Court knows all about Notice 2016-66, which labeled most small captives that elect §831(b) as potential tax abuse schemes and triggered onerous reporting requirements for small captives and their material advisors. CIC Services challenged that notice, and this Court set it aside under the Administrative Procedure Act. The IRS and Treasury Department proposed a replacement that triggers the same requirements as Notice 2016-66 and again declares most small captives to be abusive.

Like Notice 2016-66, this new rule violates the APA—and largely for the same reasons. The administrative record contains no evidence to support the notion that §831(b) has been systematically abused, let alone the rule's stronger conclusion that many small captives are abusive. And the rule impermissibly uses tax benefits approved by Congress in the Internal Revenue Code as indicators of tax abuse.

The IRS's role in tax administration is to enforce the tax laws as Congress designed them—exemptions and all—not to impose its own view of good tax policy. The decision to exempt small captives from tax on premium income "is a congressional choice," *CIC Services v. IRS*, 593 U.S. 209, 213 (2021), and no agency can override that choice. The new rule should be set aside.

1

# BACKGROUND

## I. The Tax Code promotes captive insurance for small businesses, but the IRS resists Congress's choice.

"A captive insurance company is an insurance company that is wholly owned and controlled by its insureds." *United States v. Del. Dep't of Ins.*, 66 F.4th 114, 116 n.1 (3d Cir. 2023). Captive insurance thus differs from commercial insurance, which insures the risks of unrelated entities. Captive insurance is ubiquitous in the modern economy. The world's largest firms use captives, including "[a]ll Fortune 500 companies." A.R. 22100 (IRS expert report); *see also* Chang & Chen, *Characteristics of S&P 500 Companies with Captive Insurance Subsidiaries*, 37 J. of Ins. Reg. 1, 19 (2018) (similar). But due to steep operational costs, captive insurance long remained out of reach for small businesses. That changed in 1986 when Congress encouraged small businesses to use captive insurance by creating §831(b)'s special tax treatment. Because of §831(b)'s tax benefits, "captives are no longer just for large corporations." Taylor & Sobel, *A Closer Look at Captive Insurance*, CPA J. 48 (June 2008); *see also* A.R. 22100 (IRS expert report) ("After the introduction of the small captive insurance company federal legislation in 1986, the captive industry has grown steadily").

### A. Captive insurance has many private and public benefits.

Captive insurance is widespread in the business world because it offers major private and public economic benefits. Firms benefit from captive insurance because it allows them to obtain coverage tailored to their needs, including insurance policies for low-frequency, high-severity risks that commercial insurance companies often do not underwrite. A.R. 4311, 4353. Even when coverage is available through commercial insurers, captives can offer firms lower premiums because they do not bear the overhead costs of a commercial insurance company. A.R. 4303, 4309. Insuring through a captive also reduces a firm's exposure to the volatility of commercial insurance markets, where premium prices can fluctuate widely year to year. A.R. 4349, 4885. Captive insurance thus stabilizes the firm's cash flow and makes the business environment more predictable. A.R. 4311, 4937-38. Unlike commercial insurance, where a firm's efforts to mitigate risk create profits for the outside insurer, captives keep

those profits within the corporate family. A.R. 4311, 4885. In other words, insuring through a captive allows firms to "rea[p] the captive company's underwriting revenues" when they successfully mitigate risk. *Delaware Dep't of Ins.*, 66 F.4th at 117. If a risk is too great for a captive to bear, it can purchase reinsurance at wholesale prices from the secondary market, which firms seeking commercial insurance cannot legally access. A.R. 4561, 4885.

In addition to the private benefits firms receive, captive insurance benefits the public in equally important ways. Captive insurance alleviates the moral hazard that is inherent in commercial insurance. When a firm insures through a captive, it has a financial incentive to mitigate risk, as liability ultimately remains within the corporate family. A.R. 4483, 4889. That incentive creates a safer environment for employees, customers, and members of the public affected by the firm's operations. A.R. 4463, 4634. And because captives can provide coverage where commercial policies are unavailable, firms that use captives are less likely to rely on taxpayer bailouts if catastrophe strikes. A.R. 4445, 4552. The extreme flooding and forest fires and that ravaged the United States in recent years are prime examples of why captive insurance is needed and useful. A.R. 4303, 4444. Many commercial insurance companies have curtailed or eliminated policies that cover losses from these catastrophes. A.R. 4310, 4768. Captive insurance can be the only way for property owners that are vulnerable to risks like extreme flooding and fire to obtain coverage and avoid the need for public funding to recoup their losses.

### B. Congress creates tax benefits to promote small captives.

Historically, small businesses seldom used captive insurance because of the high capital and compliance costs involved with setting up and operating a captive. A.R. 4889. States, which have "primary responsibility for regulating the insurance industry," *William Powell Co. v. Nat'l Indemnity Co.*, 18 F.4th 856, 863 (6th Cir. 2021), impose significant capitalization requirements on captives to ensure they can cover losses when risks materialize, *see, e.g.,* Tenn. Code Ann. §56-13-105. States also require captives to comply with complex regulatory requirements, including filing annual financial statements, obtaining actuarial certifications, and undergoing detailed audits. *Id.* §§56-13-108, -109. Meeting these

requirements demands the expertise of lawyers, accountants, underwriters, claims adjusters, and actuaries—services that come with substantial expense. A.R. 4873. For many small businesses, these costs and regulatory burdens made using captive insurance financially unworkable.

Congress created §831(b)'s special tax treatment to extend the benefits of captive insurance to small businesses. Starting with the Tax Reform Act of 1986, captives that issued policies under §1.2 million annually could elect not to be taxed on premium income. Pub. L. 99-514, 100 Stat. 2085, 2405. Combined with §162(a)'s pre-existing deduction for insurance premium expenses, tax savings from §831(b) allow small firms to "pay for the initial formation and operational costs of the small captive." A.R. 22100 (IRS expert report).

In 2015, Congress passed, and President Obama signed, the Protecting Americans from Tax Hikes Act, which expanded §831(b)'s tax benefits. Pub. L. 114-113, 129 Stat. 3040. The PATH Act increased §831(b)'s ceiling on premiums to $2.2 million, where it remains today. *See* §831(b)(2)(A)(i). The PATH Act also added "diversification requirements" to qualify for §831(b)'s special tax treatment. An insurance company meets those requirements if "no more than 20 percent of" its written premiums "is attributable to any one policyholder." §831(b)(2)(B)(i)(I). Alternatively, an insurance company meets the diversification requirements if its owners and their family members have roughly equal or greater ownership in the assets that the insurance company insures. §831(b)(2)(B)(i)(II).

The diversification requirements were a focal point of the PATH Act's legislative process. Some members of Congress expressed concern over the "abuse of captive insurance companies for estate planning purposes." *See* S. Rep. No. 114-16, at 3 (2015). To address that concern, the Joint Committee on Taxation proposed a diversification requirement that was "intended to narrow the application of section 831(b)." *Description of the Chairman's Mark Relating to Modifications to Alternative Tax for Certain Small Insurance Companies*, JCX-21-15 (2015), at 2, jct.gov/publications/2015/jcx-21-15/

(*JCT Proposal*). The proposal would have limited §831(b)'s tax benefits to captives with "no more than 20 percent of … written premiums … attributable to any one policyholder." *Id.*

Congress rejected the Joint Committee's proposal. The Senate version of the bill omitted the diversification requirement entirely. *See* §1, S. 905, 114th Cong. (Apr. 14, 2015). The House version struck a compromise and eventually became law. In the House version, a captive can satisfy the diversification requirement in two independent ways: *either* the captive has no more than 20 percent of its written premiums attributable to any one policyholder—the language proposed by the Joint Committee—*or* the captive's owners and their family members have roughly equal or greater ownership in the assets that the captive insures. 129 Stat. 3106-07; *see also* Joint Committee on Taxation, *Technical Explanation of the Protecting Americans from Tax Hikes Act of 2015, House Amendment #2 to the Senate Amendment to H.R. 2029*, JCX-144-15 (2015), at 201-02, jct.gov/publications/2015/jcx-144-15/ (discussing the PATH Act's two diversification options). As the Code exists today, the twenty-percent limit on policyholder concentration applies only if the captive fails the limit on family relatedness. §831(b)(2)(B).

### C.    The IRS has a long history of opposing captive insurance.

The IRS does not share Congress's positive view of captive insurance. It initially took the view that captives could not possibly offer genuine insurance. In 1977, the IRS issued a rule that disallowed businesses from deducting the costs of captive insurance premiums from their taxable income. *See* Rev. Rul. 77-316. In 2001, the IRS abandoned its position after years of litigation because "[n]o court" accepted the agency's underlying economic theory. Rev. Rul. 2001-31; *see, e.g., Humana v. Comm'r*, 881 F.2d 247, 257 (6th Cir. 1989) ("Under no circumstances do we adopt the economic family argument advanced by the government"). Going forward, the IRS pledged to assess captive insurance arrangements "based on the facts and circumstances of each case." Rev. Rul. 2001-31.

The IRS renewed its categorial opposition to captive insurance in 2016, just one year after Congress expanded §831(b) in the PATH Act. The agency issued Notice 2016-66, which declared most captives that elect §831(b) taxation to be transactions of interest, meaning they have "a potential

5

for tax avoidance or evasion." 2016-47 I.R.B. 745 (Nov. 2, 2016). Notice 2016-66 required captives

and their material advisors to file onerous and costly reports disclosing the transaction. *Id.* The notice's

criteria for labeling a captive insurance arrangement as potentially abusive mirror the criteria used by

the new regulations that are challenged here. *Id.* at 9-10.

CIC Services challenged Notice 2016-66 under the APA, and this Court invalidated it. *CIC*

*Services v. IRS (CIC Services II)*, 592 F. Supp. 3d 677 (E.D. Tenn. 2022). The notice was arbitrary and

capricious because the IRS failed to "identify any facts or data supporting its belief" that small captives

are potentially abusive. *Id.* at 685. The agency tried to justify the notice by offering "'cases in which a

court found the tax payer engaged in an abusive transaction.'" *Id.* at 686. But the Court rejected that

approach, explaining that the IRS cannot satisfy arbitrary-and-capricious review by "[s]imply including

cases in the administrative record that suggest certain tax structures could be abusively employed." *Id.*

at 687. The remaining materials in the administrative record likewise failed to justify the notice because

they lacked "facts or data" to support the IRS's suspicion of small captives. *Id.* at 686. In addition to

being arbitrary and capricious, Notice 2016-66 was procedurally defective because the IRS failed to

conduct notice-and-comment rulemaking before issuing it. *Id.* at 683. This Court set aside the notice

to remedy those APA violations. *Id.* at 687-88.

## II.    After this Court invalidated the IRS's notice, the IRS replaced it with the final rule.

The IRS eventually proposed new regulations to replace Notice 2016-66 and invited public

comment. *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 88 Fed. Reg. 21547

(Apr. 11, 2023). After making minor changes to the proposed regulations, the IRS issued a final rule

to promulgate them. *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg.

3534 (Jan. 14, 2025). The final rule and accompanying regulations designate the mine run of captives

that elect §831(b) tax treatment as either listed transactions, *see* 26 C.F.R. §1.6011-10, or transactions

of interest, *see* §1.6011-11.

The final rule labels a captive as a listed transaction—*i.e.*, a transaction "specifically identified by the [Treasury] Secretary as a tax avoidance transaction," §6707A(c)(2)—if the captive elects §831(b) taxation and fails three tests, which the final rule calls the "20 Percent Relationship Test," the "Financing Factor," and the "Loss Ratio Factor." 90 Fed. Reg. at 3,534-35; *see* 26 C.F.R. §1.6011-10.

- **20 Percent Relationship Test**: A captive fails the 20 Percent Relationship Test if at "least 20 percent" of the captive "is directly or indirectly owned, individually or collectively," by an entity insured by the captive, an owner of the insured entity, or persons related to the insured entity or its owners. 26 C.F.R. §1.6011-10(b)(1)(iii).

- **Financing Factor**: A captive fails the Financing Factor if the captive "made available as financing or otherwise conveyed … to" a policyholder, a policyholder's owners, or related entities "in a transaction that did not result in taxable income or gain" "any portion of the amounts" the captive earned from insurance contracts. *Id.* §1.6011-10(c)(1)(i).

- **Loss Ratio Factor**: A captive fails the Loss Ratio Factor if the "amount of liabilities incurred for insured losses and claim administrative expenses" is "less than 30 percent of" the "amount equal to premiums earned" by the captive minus policyholder dividends, during the last ten tax years. *Id.* §1.6011-10(c)(2)(i), (ii).

The regulations label a captive as a transaction of interest—*i.e.*, a transaction "that the Treasury Department and the IRS and believe ha[s] the potential for tax avoidance or evasion," 88 Fed. Reg. at 21,549—if the captive elects §831(b) tax treatment, fails the 20 Percent Relationship Test, and fails either the Financing Factor or the Loss Ratio Factor with an adjusted loss ratio of 60 percent. 90 Fed. Reg. at 3541, 3546; *see* 26 C.F.R. §1.6011-11(c), (e)(1).

Taxpayers that engage in listed transactions and transactions of interest must file detailed reports that describe the transaction and disclose the parties involved. 26 C.F.R. §1.6011-10(g) (listed transactions); *id.* §1.6011-11(g) (transactions of interest); *id.* §1.6011-4(d) (reporting requirements). For taxpayers who participate in listed transactions, the IRS denies them the favorable tax treatment that they would otherwise receive. *See, e.g., Tax Avoidance Using Artificially High Basis*, Notice 2000-44, 2000-36 I.R.B. 255, at 4 (Aug. 13, 2000) (designating certain partnership transactions as listed transactions);

*NPR Invs. ex rel. Roach v. United States*, 740 F.3d 998, 1014 (5th Cir. 2014) ("Notice 2000-44 warns that the IRS … will not allow deductions" based on those partnerships).

### III. Like the prior notice, the final rule injures CIC Services.

CIC Services is a Knoxville-based firm that helps small businesses form and manage a captive insurance company. Declaration of Sean King ¶¶2-3. The final rule directly regulates CIC Services and its past, present, and future clients and affiliates. Many of the firm's clients operate captives that the final rule designates as listed transactions or transactions of interest, and CIC Services has contractual obligations to assist those clients in complying with the rule's recordkeeping and reporting require-ments. ¶8. And because CIC Services is a "material advisor" to covered captives, *see* 26 C.F.R. §301.6111-3(b), CIC Services must keep additional records and file its own reports, King Decl. ¶9.

Complying with the rule's requirements imposes significant costs on CIC Services. Those costs include out-of-pocket expenses, diverted resources, increased liability insurance premiums, reduction in the firm's market value, loss of existing and future clients, reputational damage, and the threat of civil and criminal liability. ¶¶11-17. CIC Services seeks vacatur, declaratory, and injunctive relief to alleviate these injuries caused by the final rule.

### SUMMARY OF ARGUMENT

**I.** The final rule violates the APA because it exceeds Defendants' statutory authority. 5 U.S.C. §706(2)(C). Congress sets tax policy and determines who qualifies for tax benefits. Treasury and IRS cannot deny favorable tax treatment to a Code-supported transaction, and they cannot impose their own restrictions on tax benefits. They must enforce the tax policies that Congress enacted. The final rule oversteps this division of authority in two related ways.

**A.** The final rule imposes new requirements on §831(b) tax treatment.

Under the final rule, a captive is a listed transaction and will be denied §831(b)'s tax benefits if it fails three agency-created tests: the 20 Percent Relationship Test, the Financing Factor, and the Loss Ratio Factor. The mine run of §831(b) captives won't pass these rigged tests. By dint of simple

division, most captives have policyholder concentration that exceeds twenty percent. Related party financing is a primary advantage of captive insurance and one that courts have previously approved, and many small captives offer it. And because captives typically insure low-frequency, high-severity risks, their loss ratios are often low compared to commercial insurance providers. By imposing tests that target common features of captives, the final rule dramatically reduces the pool of taxpayers that are eligible for §831(b).

Defendants claim power to narrow §831(b) from their authority to identify tax avoidance transactions. But agencies cannot "reject a Code-compliant transaction in the service of general concerns about tax avoidance." *Summa Holdings v. Comm'r*, 848 F.3d 779, 787 (6th Cir. 2017). A Code-supported transaction can be declared tax avoidant only if the transaction lacks economic substance, meaning the transaction's "fiscal realities" show that the taxpayer's "labels" are false. *Id.* at 785. But the economic substance doctrine does not allow Defendants to impose new restrictions on §831(b). The final rule does just that, so it exceeds Defendants' statutory authority.

**B.** The final rule's 20 Percent Relationship Test removes one of the PATH Act's options for satisfying §831(b)'s diversification requirements and modifies the other one.

Under the PATH Act, a small captive qualifies for §831(b) if *either* twenty percent or less of its premiums are attributable to a single policyholder, *or* the captive's owners and their family members hold roughly the same or greater interest in the insured companies as they do in the captive. But the final rule's 20 Percent Relationship Test requires that less than 20 percent of a captive's premiums are attributable to a single policyholder, and that test applies *even if* the captive satisfies the PATH Act's second diversification option. And while the PATH Act requires a minimum of only five owner-policyholders, the final rule requires a minimum of six.

Defendants cannot by regulation alter or eliminate options that Congress provides by statute. *Summa Holdings*, 848 F.3d at 789. The PATH Act's either-or diversification requirements are the

product of legislative compromise. The final rule upsets that compromise because Defendants believe "the PATH Act diversification requirements are not sufficient." 90 Fed. Reg. at 3,554. Defendants have no such authority to alter Congress's legislative choices.

**II.** The final rule also violates the APA because it is arbitrary and capricious. 5 U.S.C. §706(2)(A). When issuing a rule, agencies must compile data on the regulatory issue, examine the data, and make rational decisions based on what the data show. They must also explain their decisions to prove that they took these steps and to allow for judicial review. Agencies cannot rely on factors Congress did not want them to consider, and their explanation must be the real one, not a pretextual justification for a decision they already made. The final rule violates these rulemaking requirements in four ways.

**A.** The agencies did not sufficiently heed this Court's prior decision: The administrative record lacks "facts or data" to support Defendants' conclusion that small captives are abusive or have the potential for abuse. *CIC Services II*, 592 F.Supp.3d at 685.

Most of the administrative record consists of the same materials—statutes, prior regulations, and case law—that this Court held were insufficient to justify Notice 2016-66. The new material in the record largely consists of documents related to tax litigation, including the parties' briefing and expert reports. But if the actual court decisions in those cases didn't justify Notice 2016-66, then the parties' mere submissions in those cases can't justify the final rule either.

Notably, the administrative record lacks any systematic analysis of §831(b) captives that might support Defendants' conclusions that they are abusive or have the potential for abuse. The lack of such an analysis is inexplicable, since Notice 2016-66 gave the IRS over 100,000 disclosures from small captives. Those reports could have substantiated or disproved Defendants' suspicion of small captives. But there is no indication in the record that Defendants even looked at them.

**B.** The final rule claims that the 20 Percent Relationship Test, Financing Factor, and Loss Ratio Factor identify a pattern that consistently gives rise to tax abuse, but Defendants failed to adequately explain how they reached that conclusion. Although Defendants say the tests are based on taxpayer examinations and caselaw, neither source supports them.

The final rule does not substantively discuss taxpayer examinations, and the administrative record does not include them. Although Defendants say taxpayer examinations are confidential, the APA's reasoned-explanation requirement has no exception for agency action based on confidential information. *Flyers Rights Educ. Fund. v. FAA*, 864 F.3d 738, 745-46 (D.C. Cir. 2017). Moreover, the Code allows Defendants to disclose information from taxpayer examinations in anonymized or summary form, and the APA allows Defendants to submit material from the administrative record under seal. Defendants took none of those steps. They cannot rely on unexplained assertions from hidden data to justify the final rule.

Caselaw also does not justify the final rule. The final rule cites only a handful of cases where a court concluded that a small captive abused §831(b). But given that provision's decades-long history and the over 100,000 small captives that currently use it, a few instances of captive abuse fail to establish a pattern. Besides, the final rule attempts to justify only two of the tests—the Financing Factor and Loss Ratio Factor—in terms of caselaw, and it fails to do so in a way that can withstand scrutiny. In explaining the 20 Percent Relationship Test, the final rule merely asserts that higher policyholder concentrations are abusive. The APA requires more than ipse dixit.

**C.** Aside from being unsupported by taxpayer examinations and caselaw, Defendants' explanation for the final rule's tests relies on impermissible factors. As indicators of tax abuse, the final rule points to the tax advantages that small captives receive and policyholder concentrations above 20 percent. But Defendants cannot consider those features abusive because the Code authorizes them.

The final rule says small captives are abusive because they allow taxpayers to defer taxation and offers an example to illustrate the point. The problem with the example, however, is that the transaction's tax advantages all follow directly from the Code. Defendants cannot penalize captives for using Code provisions that Congress "designed for tax-reduction purposes." *Summa Holdings*, 848 F.3d at 786.

The final rule also says that the closely held nature of captives indicates abuse. Congress addressed that concern in the PATH Act. The Act's diversification requirements set specific limits on how related captives can be to their owner-policyholders to qualify for §831(b). Defendants cannot rely on Code-compliant policyholder concentrations as indicators of tax abuse.

**D.** The many failings in Defendants' explanations show that the final rule is mere pretext—the latest in a decades-long effort to limit the use of §831(b). Other evidence of pretext abounds. The IRS's own experts identified certain indications of §831(b) abuse, but the final rule ignores them. Captive arrangements both large and small must offer genuine insurance to qualify for §162(a)'s tax deduction, but the final rule targets only small captives that elect §831(b). And the final rule allows small captives to satisfy the Loss Ratio Factor by issuing a dividend, even though distributions to shareholders have no bearing on whether a captive offers genuine insurance or complies with the Code's other requirements for §831(b). In response to comments during rulemaking, Defendants denied that their goal was to chill the use of §831(b). But as emails in the administrative record reveal, IRS officials correctly suspected that chilling the use of §831(b) was exactly the agency's motivation.

**III.** CIC Services is entitled to summary judgment and a remedy for Defendants' APA violations. The Court should set aside the final rule. The Court should also enter a declaratory judgment specifying the nature of Defendants' APA violations and enjoin Defendants from enforcing the final rule and accompanying regulations against CIC Services, its clients, and its affiliates.

## ARGUMENT

The APA requires courts to "hold unlawful and set aside" agency rules and regulations that are "in excess of statutory jurisdiction, authority, or limitations" or are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A), (C). On a motion for summary judgment, courts examine the administrative record to determine whether the agency acted within its statutory authority and otherwise complied with the APA, including whether "evidence in the administrative record permitted the agency to make the decision it did." *CIC Services II*, 592 F.Supp.3d at 683 (cleaned up). Courts determine the scope of an agency's statutory authority without deferring to the agency's interpretation. *Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 413 (2024).

### I. The final rule exceeds Defendants' statutory authority.

Congress alone has the power to set tax policy, including the scope and qualifications of tax benefits. *Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 340 (1974). Agencies "'cannot by [their] regulations alter or amend a revenue law.'" *Acker v. Comm'r*, 258 F.2d 568, 577 (6th Cir. 1958). They cannot "deprive a taxpayer of a benefit conferred by statute." *Brooks v. United States*, 473 F.2d 829, 832 (6th Cir. 1973). And they cannot "add a restriction to the statute [that] is not contained in the statute." *Nat'l Life & Acc. Ins. Co. v. United States*, 524 F.2d 559, 560 (6th Cir. 1975). Agencies must instead give the Tax Code its "natural and plain meaning effect," even "though they may disagree with the result." *Id.* "The wisdom both of the tax and of its measurement [is] for Congress to determine." *United States v. Jacobs*, 306 U.S. 363, 371 (1939).

Interpreting the Code de novo, *see Loper Bright*, 603 U.S. at 413, the final rule and accompanying regulations exceed Defendants' statutory authority in two related ways: They add new requirements to qualify for §831(b). And they remove an option for satisfying §831(b)'s diversification requirements. Both flaws are fatal.

#### A. The final rule adds new requirements to §831(b).

The final rule labels a captive insurance arrangement as a listed transaction—*i.e.* a transaction that the IRS "has determined to be a tax avoidance transaction"—if the captive fails the 20 Percent

Relationship Test, the Financing Factor, and the Loss Ratio Factor. 90 Fed. Reg. at 3,534. These agency-created tests have no basis in the Code, which requires only that a captive meets an inflation adjusted limit on annual premiums, satisfies one of two diversification requirements, and makes a valid election. §831(b)(2)(A)(i), (ii), (iii). Under the final rule, a captive that meets the Code's requirements but does not pass the final rule's tests loses §831(b)'s tax benefits. *See NPR Invs.*, 740 F.3d at 1014.

Most small captives will fail the final rule's tests. Because small captives are small, they typically have fewer than six owner-policy holders and thus don't pass the 20 Percent Relationship test. A.R. 4325. The Financing Factor targets related party financing, which is a key advantage of captive insurance companies, and Defendants admit that such financing does not "itself … rise to the level of tax avoidance." 90 Fed. Reg. at 3,546. As for the Loss Ratio Factor, captives often have lower loss ratios than commercial insurers because they cover "low-frequency, high-severity risks," a fact that courts have recognized and that Defendants also admit in the final rule. *Id.* at 3,541; *see, e.g., R.V.I. Guarantee Co. v. Commissioner*, 145 T.C. 209, 227-28 (2015). In short, the final rule's tests are designed so that small captives will fail them, allowing the IRS to deny them favorable tax treatment under §831(b). Those tests exceed Defendants' statutory authority because they deny by regulation tax benefits that Congress provided. *See Brooks*, 473 F.2d at 832; *Nat'l Life*, 524 F.2d at 560.

Defendants invoke §6707A—their power to regulate tax-avoidance transactions—to justify the final rule, but that provision doesn't supply the needed authority. Regulations cannot "reject a Code-compliant transaction in the service of general concerns about tax avoidance." *Summa Holdings*, 848 F.3d at 787. "Many provisions of the Code owe their existence solely to tax-reducing purposes: to lower current taxes or to shelter income from taxes over time." *Id.* at 788. If a tax-advantaged transaction complies with the Code, Defendants cannot declare it tax avoidant unless it lacks economic substance. *Id.* at 785.

The economic substance doctrine does not save the final rule. That doctrine allows Defendants to look beyond the taxpayer's "labels" and determine tax liability based on a transaction's "fiscal realities." *Id.* For example, agencies can disregard a transaction where the claimed tax benefits flow from "sham 'services' that [were] never performed." *Id.* at 786. They can deny favorable tax treatment of putative loans that lack the "classic hallmark[s] of real loans." *Billy F. Hawk, Jr. v. Comm'r*, 924 F.3d 821, 826-27 (6th Cir. 2019). And they can treat property as belonging to a taxpayer despite "the interposition of an economically meaningless subtrust." *McGowen v. United States*, 143 F.4th 686, 697 (6th Cir. 2025). The power to disregard sham transactions comes from the principle that, "while taxpayers are free to arrange their affairs to minimize taxes, they must do so in real ways—ways that give a transaction economic teeth and do not merely place tax-avoiding labels on tax-owing transactions." *Billy F. Hawk*, 924 F.3d at 825 (citing *Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Summa Holdings*, 848 F.3d at 787). But agencies cannot declare a Code-supported transaction to be sham just because it shelters income that they think Congress *should have* taxed but didn't. *Summa Holdings*, 848 F.3d at 785.

The final rule isn't about looking past a taxpayer's labels. The final rule's tests don't ask, for example, whether a captive fails to meet the risk shifting and risk distribution requirements for providing genuine insurance. *See Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941) (defining insurance for tax purposes). The final rule disclaims that its tests enforce the "defin[ition of] insurance for Federal tax purposes." 90 Fed. Reg. at 3,546. Nor do the final rule's tests ask if a captive "never performed" on its insurance contracts. *Summa Holdings*, 848 F.3d at 786. Instead, the final rule requires captives to meet new requirements to receive §831(b)'s tax benefits: They must maintain a certain loss ratio, refrain from related party financing, or limit the concentration of their policyholders. Section 831(b) does not impose those limits, and Defendants cannot add them by regulation. *See Brooks*, 473 F.2d at 832; *Nat'l Life*, 524 F.2d at 560. The final rule exceeds Defendants' statutory authority. 5 U.S.C. §706(2)(C).

**B. The final rule alters the PATH Act's diversification requirements.**

The final rule and accompanying regulations exceed Defendants' statutory authority for a second reason: The 20 Percent Relationship Test removes one of the PATH Act's options for satisfying §831(b)'s diversification requirements, and it alters the other one.

Under the PATH Act, a captive that wishes to elect §831(b) tax treatment has two ways to satisfy §831(b)'s diversification requirements. For option one, the captive must reduce policyholder concentration so that "no more than 20 percent" of the captive's premiums is "attributable to any one policyholder." §831(b)(2)(B)(i)(I). For option two, the captive's owners and their family members must hold roughly the same or greater interest in the insured companies, in percentage terms, as they do in the captive. §831(b)(2)(B)(i)(II). A captive that satisfies either option is entitled to §831(b)'s tax benefits so long as it meets the limit on annual premiums and makes a valid election. §831(b)(2)(B).

The final rule overrides the PATH Act's either-or choice for diversification and requires captives to lower policyholder concentration. To avoid being classified as a listed transaction or transaction of interest, the 20 Percent Relationship Test requires a captive to have less than "20 percent of [its]" assets, voting power, or equity interests "directly or indirectly owned" by an insured company, its owners, or related corporate entities. 90 Fed. Reg. at 3,554; 26 C.F.R. §§1.6011-10(b)(1)(iii), 1.6011-11(b)(1). That test is functionally equivalent to the PATH Act's 20-percent policyholder rule. Because captives are, by definition, owned by their policyholders, the percentage of premiums attributable to a single policyholder will generally match that policyholder's ownership stake in the captive. A.R. 4392. Thus, by sleight of hand, the final rule forces small captives to reduce the concentration of their policyholders even though the PATH Act gives them a second way to satisfy the diversification requirement. Moreover, the final rule changes the remaining diversification option available to captives. The PATH Act allows policyholder concentrations of 20 percent or less, meaning a captive can have five or more owner-policyholders. But the 20 Percent Relationship Test requires policyholder concentration of be less than 20 percent, meaning the captive must have at least *six* owner-policyholders.

Defendants cannot by regulation alter or eliminate options that Congress provides by statute. *Summa Holdings*, 848 F.3d at 789. That is especially true in this case, where Congress considered—but ultimately rejected—a version of the PATH Act that would have left captives no option but to reduce policyholder concentration. The rejected proposal was "intended to narrow the application of section 831(b)" to address the concerns expressed by some legislators that captives were being used for estate planning. *JCT Proposal*, *supra*. But that proposal did not become law. Instead, Congress enacted an either-or approach to achieving sufficient diversification, which frees captives that do not raise estate-planning concerns from limits on policyholder concentration.

When commenters pointed out that the 20 Percent Relationship Test is inconsistent with the PATH Act, Defendants merely asserted that "the PATH Act diversification requirements are not sufficient to eliminate the possibility that a transaction is or may be a tax avoidance transaction." 90 Fed. Reg. at 3,554. But that's backwards. Congress, not the agencies, decides whether a transaction should be taxed, and Congress sets the criteria for transactions that qualify for special treatment. *Brooks*, 473 F.2d at 832; *Nat'l Life*, 524 F.2d at 560. Agencies have no authority to disregard those policy choices.

## II. The final rule is arbitrary and capricious.

The APA requires agencies to make rational decisions based on evidence in the administrative record. *Dep't of Comm. v. New York*, 588 U.S. 752, 773-74 (2019). To survive arbitrary-and-capricious review, agency action must be both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency's decision is not reasonable if it "'relied on factors which Congress had not intended it to consider,'" "'entirely failed to consider an important aspect of the problem,'" "'offered an explanation for its decision that runs counter to the evidence before the agency,'" or "'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Atrium Med. Ctr. v. HHS*, 766 F.3d 560, 567 (6th Cir. 2014) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). An agency's decision is not reasonably

explained if it fails to demonstrate "'a rational connection between the facts found and the choice made.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *State Farm*, 463 U.S. at 43). The explanation must be based on the administrative record that was before the agency at the time the decision was made, not the agency's post-hoc rationalizations. *Dep't of Comm.*, 588 U.S. at 780. The agency's explanation must be "genuine" and not pretext for a decision that was already made. *Id.* at 785.

The final rule is arbitrary and capricious for four related reasons: The administrative record does not contain facts or data supporting Defendants' conclusions that small captives are abusive or potentially abusive; the final rule's explanation for arriving at those conclusions is inadequate, the final rule considered improper factors; and Defendants' stated rationale for issuing the final rule is pretextual.

## A. The administrative record lacks facts or data to support the final rule's conclusions.

The final rule's administrative record suffers the same fundamental defect as the administrative record underlying Notice 2016-66: It contains no "facts or data" supporting Defendants' conclusions that small captives are abusive. *CIC Services II*, 592 F.Supp.3d at 685. The bulk of the final rule's record consists of the same kinds of materials this Court held were insufficient in *CIC Services II. See id.* 685-87. There are thousands of pages of federal statutes and legislative history. A.R. 1089-3870; 4075-168; 4169-283; 4284-92; 5349-51; 5582-94; 5626-5730, 13431-43. Hundreds of pages of regulations and subregulatory guidance. A.R. 933-1015; 3871-95; 3907-4074; 5153-63, 9815-44; 13148-167. And hundreds more pages of court decisions assessing whether a particular captive was valid—with a court sometimes finding for the captive and other times against it. A.R. 2-932; 3896-906; *compare, e.g.*, *Rent-A-Center, Inc. v. Comm'r*, 142 T.C. 1 (2014) (valid captive), *with Clougherty Packing Co. v. Comm'r*, 84 T.C. 948 (1985) (invalid captive). Those materials were not enough to sustain Notice 2016-66, and they fare no better here.

The shortcoming in the final rule's record is even worse than the shortcoming in Notice 2016-66's record. Notice 2016-66 was based on the IRS's asserted "belief" that §831(b) captives have a "potential" for abuse. *CIC Services II*, 592 F.Supp.3d at 685. But in the final rule, that belief has ripened into a firm conclusion that many small captives *are* tax abusive. 90 Fed. Reg. at 3,534. Greater degrees of certainty in an agency's conclusions require greater degrees of proof. *Cf. Encino Motorcars v. Navarro*, 579 U.S. 211 (2016). The final rule needs more evidence to justify its determination that captive arrangements are abusive than Notice 2016-66 needed to justify a mere suspicion of abuse. The final rule's administrative record does not contain evidence to support Defendants' strengthened conclusions.

Much of the record underlying the final rule consists of documents related to litigation over whether a particular captive offered genuine insurance. Party briefing in those cases makes up almost a third of the 24,000-page record. *See* A.R. 14245-607; 15090-16945; 17088–714, 18127–21328, 21678-21869, 22147-23319. But if the courts' decisions in those cases were not enough to sustain Notice 2016-66, then the parties' adversarial briefing cannot sustain the final rule either. *See CIC Services II*, 592 F.Supp.3d at 687. The record also includes the parties' expert reports in those cases, but they too fail to support the final rule. Like the parties' legal briefs, the expert reports debate the proper tax treatment of a particular captive arrangement, with some concluding that the captive under review offered genuine insurance, and others concluding that the captive lacked economic substance. *Compare* A.R. 22026 (concluding the captive was valid) *with* A.R. 22118 (concluding the captive was invalid). But none of these reports concludes that small captives in general are abusive. To the contrary, the IRS's own expert recognized that captive insurance companies "both large and small, are very useful and efficient risk financing tools." A.R. 22100.

The administrative record contains no systematic analysis of §831(b) captives that might support the final rule. The absence of such an analysis is notable because Defendants have a massive

dataset to work from. As a result of Notice 2016-66, the IRS unlawfully obtained "over 100,000" disclosures from taxpayers and material advisors that provide detailed information about how small captives are structured and deployed. A.R. 13850. The IRS was allowed to retain and use that information, *see CIC Services v. IRS (CIC Services III)*, 2022 WL 2078036, *3 (E.D. Tenn. June 2, 2022), and the final rule claims that "[e]xaminations of taxpayers and promoters have helped to clarify" Defendants' position, 90 Fed. Reg. at 3,538. Yet there is no sign in the administrative record that the agencies conducted any general assessment of §831(b) abuse. Defendants' decision to label small captives as actually or potentially abusive was a foregone conclusion. *See infra* III.

### B. The final rule is not reasonably explained.

Even if evidence of §831(b) abuse lurked somewhere in the administrative record, the final rule fails to cite that evidence or explain how it led to Defendants' conclusions. The lack of an adequate explanation dooms the Rule. *Atrium Med. Ctr.*, 766 F.3d at 567.

The final rule's justification for imposing the 20 Percent Relationship Test, Financing Factor, and Loss Ratio Factor is that those tests "identify fact patterns that are consistently present" in abusive captive arrangements. *See, e.g.,* 90 Fed. Reg. at 3,539, 3,543, 3,546, 3,554, 3,555. The final rule grounds that explanation in two sources of evidence: (1) "examined cases" where the IRS determined the captive does not offer genuine insurance and (2) "micro-captive cases tried on their merits." *See, e.g., id.* at 3539, 3555. Neither source supports the final rule.

#### 1. Taxpayer examinations do not support the final rule.

According to the final rule, the "IRS is confident from its review of examinations" that the 20 Percent Relationship Test, Financing Factor, and Loss Ratio Factor identify "a fact pattern that consistently gives rise to tax avoidance." 90 Fed. Reg. at 3,555. Despite the asserted confidence, the final rule offers no account of what the IRS learned from conducting the examinations—which are not included in the administrative record—or how that knowledge informed the content of the final rule's tests. Instead, Defendants attempt to sidestep the APA's reasoning requirement by asserting that the

Code "prohibits the IRS from discussing taxpayer return information." *Id.* at 3,539, 3,540. But the APA has no exception for agency action that is purportedly based on confidential information.

Agencies must "'disclose the basis'" of their action so courts can inspect the agencies' reasoning. *Dep't of Comm.*, 588 U.S. at 780. Courts cannot uphold agency action based on explanations that rely on information not in the administrative record, even if that information is confidential. *Flyers Rights Educ. Fund. v. FAA*, 864 F.3d 738, 745-46 (D.C. Cir. 2017). When "'the data relied on by [an agency] in reaching its decision is not included in the administrative record and is not disclosed to the court,'" courts are unable to "'determine whether the final agency decision reflects the rational outcome of the agency's consideration of all relevant factors.'" *Id.* (cleaned up). Agency action based on supposedly "'reliable data reposing in [an agency's] files' simply cannot withstand scrutiny." *U.S. Lines v. Federal Maritime Comm'n*, 584 F.2d 519, 535 (D.C. Cir. 1978).

There are ways for agencies to act based on confidential information while complying with the APA. Defendants could have included anonymized versions of taxpayer examinations in the administrative record or disclosed their findings in summary form. *See* §6103(b)(2); *see also* 90 Fed. Reg. at 3,539 (acknowledging that the Code allows anonymized disclosures). Or Defendants could have sought leave to file portions of the administrative record under seal. *See, e.g., Kubacki v. U.S. Dep't of Agric.-Farm Serv. Agency*, 2013 WL 4052916, at *8 (E.D. Mich. Aug. 12, 2013); *Atlantic Arts Found. v. SBA*, 2023 WL 8101074, at *1 n.1 (D.D.C. Nov. 21, 2023).

Defendants took none of those steps. Instead, Defendants ask the Court to "trust [them]" when they say taxpayer examinations support the final rule. *Flyers Rights*, 864 F.3d at 746. "But that is not how judicial review works." *Id.* The APA requires an agency to "provid[e] something in the way of documentary support for its action" so courts can "ensure that the agency articulated a rational connection between the facts found and the choice made." *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (cleaned up). Defendants' "trust us" explanation is incompatible with APA review.

### 2. Caselaw does not support the final rule.

As the other basis for explaining the final rule, Defendants offer "micro-captive cases tried on their merits." 90 Fed. Reg. at 3,539. But the cases cited in the final rule likewise fail to support Defendants' explanation that the final rule's tests consistently identify tax abuse. Small captives have been common since 1986 when §831(b) was first enacted. A.R. 22100 (IRS expert report). And disclosures from Notice 2016-66 show that at least 100,000 small businesses currently use captives that elect §831(b). A.R. 13850. Yet despite all those years of operation, the final rule identifies only a handful of court decisions finding that a small captive failed to offer genuine insurance. *See* 90 Fed. Reg. at 3,538 (citing 7 cases); *but see Puglisi v. Comm'r*, 2021 WL 7162530 (T.C. Oct. 29, 2021) (IRS conceding that the captive under review was valid and entitled to §831(b) tax treatment); 90 Fed. Reg. at 3,539. That such a small percentage of small captives have ever been invalidated shows that §831(b) is *not* rife with abuse. Defendants cannot rationally reach the opposite conclusion by pointing to a few cases that came out the other way. *See CIC Services II*, 592 F.Supp.3d at 687.

Even if Defendants could justify their tests based on anecdotal examples from caselaw, the final rule fails to do so. Only two of the tests—Financing Factor and Loss Ratio Factor—are explained in terms of caselaw, and those explanations don't hold up.

To justify the Financing Factor, the final rule cites three cases where an abusive captive engaged in related party financing. *See* 90 Fed. Reg. at 3,546. Again, given §831(b)'s decades' long history, three examples hardly demonstrate a consistent pattern of abuse. *Cf. Bryant v. City of Cincinnati*, -- F.Supp.3d --, 2025 WL 860931, *17 (S.D. Ohio Mar. 19, 2025) ("three examples over the course of eight years [are] not enough to amount to a *pattern*" of misconduct). But even putting aside the dearth of supporting cases, Defendants' reasoning is illogical. Just because some abusive captives engage in related party financing does not mean related party financing indicates abuse. One of Defendants' own cases exposes the flaw in that reasoning. *See* 90 Fed. Reg. at 3,546. In *Avrahami v. Commissioner*, the Tax Court found that a related-party financing transaction was *not* abusive. 149 T.C. 144, 199-204

(2017). Indeed, the final rule recognizes that related party financing does not "itself … rise to the level of tax avoidance." 90 Fed. Reg. at 3,546. To draw any reliable conclusion about abuse from the presence of related party financing, Defendants must consider how often *non*-abusive captives rely on related party financing. The final rule makes no attempt at that comparative analysis.

Caselaw also does not justify the Loss Ratio Factor. The final rule derives the 30-percent loss ratio for listed transactions from a single case: *R.V.I. Guarantee Co. v. Commissioner*, 145 T.C. 209 (2015), *see* 90 Fed. Reg. at 3,541. But *R.V.I.* doesn't support Defendants' number. The insurance company there had a loss ratio of only 28 percent in the ten-year period between 2000 and 2009, and the Tax Court held that it provided valid insurance for federal tax purposes. 145 T.C. at 216, 227. The final rule "recognizes that low loss ratios may be the result of coverage of low-frequency, high severity risks" that captives typically insure. 90 Fed. Reg. at 3,541. But under the final rule, captives that experience a higher ten-year loss ratio than the company in *R.V.I.* are now classified as abusive transactions, and captives with significantly higher loss ratios are classified as potentially abusive. 90 Fed. Reg. at 3,541 (30% loss ratio for listed transactions), 3,542 (60% loss ratio for transactions of interest).

The final rule's explanation of how it got the 30-percent figure from *R.V.I.* relies on an accounting trick. It notes that the insurance company's average loss ratio for five overlapping ten-year periods was 32 percent, and then "rounded down" that figure to 30 percent. 90 Fed. Reg. at 3,541. But that's not the calculation that the Loss Ratio Factor uses. It requires captives to calculate their loss ratio by averaging the "most recent ten taxable years," not by averaging the loss ratios of five, hand-picked decades. *See* 26 C.F.R. §1.6011-10(b)(2)(ii). Defendants' ad hoc and self-serving method of calculating *R.V.I.*'s loss ratio is an arbitrary explanation, not a rational one, and it does not support the Loss Ratio Factor.

The final rule does not rely on caselaw (or taxpayer examinations) to explain the 60% Loss Ratio Factor for transactions of interest. *See* 90 Fed. Reg. at 3,540-43. Nor could it. Courts have upheld

23

tax benefits for insurance companies with significantly lower loss ratios. *See, e.g., R.V.I.*, 145 T.C. at 214 (28% for 2000-2009); *see also* 90 Fed. Reg. at 3,540 (acknowledging that the IRS conceded in *Puglisi* that a captive with a low loss ratio provided genuine insurance). Rather than deriving the 60% figure from caselaw, the final rule instead uses data from the National Association of Insurance Commissioners as a benchmark. 90 Fed. Reg. at 3,541-42. As commenters noted, however, comparing NAIC data is inappropriate because the dataset includes "lines of coverage … that captives do not typically write, or may not be permitted to write" and thus "skew[s] industry-wide loss ratios higher." *Id.* at 3,542; *see also Rent-A-Center*, 142 T.C. at 12 (explaining why loss ratios of commercial insurers are incommensurate with captives' loss ratios). Another commentor identified a better dataset for comparison, the AM Best Company's average loss ratios for small insurance companies, and the final rule gave an arbitrary explanation for rejecting it. 90 Fed. Reg. at 3,542. According to the final rule, comparison to the AM Best dataset is "inappropriate" because it includes lines of coverage that small captives "are not generally permitted to cover." *Id.* But the same is true of the NAIC dataset. *See id.* Agencies are allowed to rely on imperfect data to guide their decisions, so long as their explanation is "reasonable." *Prometheus*, 592 U.S. at 427. The final rule's explanation for choosing the NAIC dataset over AM Best was not reasonable because its sole reason for rejecting AM Best data was a defect that exists in NAIC data too. The final rule is arbitrary and capricious for this additional reason.

The final rule also does not rely on caselaw to explain the 20 Percent Relationship Test. *See* 90 Fed. Reg. at 3,554-55. That's because caselaw doesn't support it. The 20 Percent Relationship Test focuses on the degree of relatedness among policyholders. But caselaw makes clear that the defining features of insurance—risk shifting and risk distribution—can be present when policyholders are related. *See, e.g., Humana*, 881 F.2d at 252 ("Risk shifting exists between the subsidiaries and the insurance company"); *Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1300 (9th Cir. 1987) (discussing the mathematical conditions for risk distribution). Rather than rely on caselaw, the final rule just asserts that

the 20 Percent Relationship Test along with the others "describe fact patterns that strongly indicate tax avoidance or the potential for tax avoidance." 90 Fed. Reg. at 3,554. But under the APA, "conclusory statements will not do; an agency's statement must be one of reasoning." *Amerijet Intern. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cleaned up). The final rule fails to supply any reasoning to support the 20 Percent Relationship Test.

*     *     *

"Deciding whether agency action was adequately explained requires … knowing where to look for the agency's explanation." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 20 (2020). The final rule pointed the Court to two sources—tax examinations and caselaw—but neither supports Defendants' conclusions. Defendants' failure to make good on their claim that those sources support the final rule's tests is fatal.

Aside from the explanations for the tests themselves, the final rule's explanation for using the tests to designate transactions of interest is also inadequate. A transaction of interest is one that Defendants "lack enough information to determine whether the transaction should be identified specifically as a tax avoidance transaction." *AJCA Modifications to the Section 6011 Regulations*, 72 Fed. Reg. 43146 (Aug. 3, 2007). Notice 2016-66 applied the same tests as the final rule to designate potentially abusive transactions, with only an insignificant change to the Loss Ratio Factor. *See* 2016-47 I.R.B. 745; *see also* A.R. 13739 (IRS email chain) (small change in loss ratio makes "essentially zero" difference for Notice 2016-66's scope). Notice 2016-66 resulted in 5 years of collection and over 100,000 disclosures. A.R. 13,850. Yet, despite the reams of information Defendants already received, the final rule implausibly claims that they still lack enough information to determine whether these captives are abusive. Commenters raised this problem, and the final rule merely responded that "the IRS needs to continue collecting information." 90 Fed. Reg. at 3,555-56. That conclusory explanation is inadequate.

## C. The final rule relies on impermissible factors.

Beyond the lack of support for the final rule in the administrative record and Defendants' inadequate explanations, the final rule is arbitrary and capricious for a third reason: Defendants "'relied on factors which Congress has not intended it to consider.'" *Atrium Med. Ctr.*, 766 F.3d at 567 (quoting *State Farm*, 463 U.S. at 43). As indicators of an abusive captive arrangement, the final rule relies on the combined effect of various tax exemptions (or lack of applicable taxes) and the presence of 20-percent or more concentration among a captive's policyholders. But captive arrangements having both features comply with the Code. Defendants cannot rely on those congressionally-approved features as indicators of tax abuse. *See Summa Holdings*, 848 F.3d at 787.

### 1. Favorable tax consequences of code-supported transactions cannot indicate tax abuse.

The final rule points to "the indefinite deferral of tax" as "[o]ne of the key abuses" of captives that receive special tax treatment under §831(b). 90 Fed. Reg. at 3,546. The final rule gives an example where the insured entity "deducts amounts paid" to a captive under §162(a), and the captive then "exclude[s] those amounts from taxable income under section 831(b)." *Id.* Later, the captive provides financing to a related insured through a transaction "for which a current tax does not apply," like "loan[s]" or "capital contributions to a special purpose vehicle." *Id.* The final rule deems transactions of this sort to be "abusive" because they do not directly result in a taxable event. *Id.*[*]

Each element of the example transaction complies with the Code, and Defendants cannot rely on the resulting tax advantages as indicators of tax abuse. Half of the supposed abuse results from

---

[*] Contrary to the final rule's description, money involved in the example transaction does not avoid taxation indefinitely. Captives pay immediate tax on income from investing premiums they receive from their insureds. §831(b)(1). And any capital that captives and their insureds accumulate through the operation of §831(b) and §162(a) is taxed whenever there is a realization event, like a shareholder distribution. *See, e.g.*, §61(a)(7). Whether corporations retain too much of their earnings in effort to avoid a realization event is a frequent subject of tax policy debate. *See, e.g., Moore v. United States*, 602 U.S. 572, 579 (2024); *U.S. v. Byrum*, 408 U.S. 125, 141 & n.17 (1972) (discussing tax on accumulated earnings). But that policy debate is for Congress to resolve, not Defendants. *See Dixon v. United States*, 381 U.S. 68, 73 (1965).

§162(a)'s tax deduction for premium payments combined with §831(b)'s tax exemption for premium income. That a captive arrangement uses those provisions to its advantage does not indicate abuse because Congress "designed [those provisions] for tax-reduction purposes." *Summa Holdings*, 848 F.3d at 786; *see also CIC Services*, 593 U.S. at 213 (that §162(a) combined with §831(b) result in money that "does not get taxed at all … is a congressional choice"). The other half of the supposed abuse results from transactions that Congress chose not to tax. *See* §61(a) (omitting loans from definition of income); §118(a) (excluding capital contributions from income); *see also* 90 Fed. Reg. at 3,546 (conceding that certain related party financing does not itself indicate abuse). The Code does not prohibit a taxpayer from using these favorable tax rules in combination, and the final rule does not claim otherwise. If a taxpayer invests "the time and patience (and money) to understand how a complex set of tax provisions could lower its taxes," Defendants cannot label the arrangement abusive on the theory that "the *effect* of these transactions was to evade" taxes. *Summa Holdings*, 848 F.3d at 781-82 (emphasis added). Defendants must honor the Code's "natural and plain meaning effect" even if "they may disagree with the result." *Nat'l Life*, 524 F.2d at 560.

> ### 2. Code-compliant levels of policyholder concentration cannot indicate tax abuse.

The final rule also points to the "closely held nature" of captive arrangements as an indicator of tax abuse. 90 Fed. Reg. at 3,539. The 20 Percent Relationship Test thus requires a captive's policyholders to have less than a 20 percent ownership interest in the captive. 26 C.F.R. §1.6011-10(b)(1)(iii). Because a captive's policyholders are also its owners, that means a captive must have at least six owner-policyholders to avoid being labeled a listed transaction or transaction of interest under the final rule. The 20 Percent Relationship Test's limit on policyholder concentration differs from the PATH Act, which requires that "no *more* than 20 percent" of a captive's premiums come from one policyholder—setting a floor of five owner-policyholders—and applies only if the captive fails the family relatedness test. §831(b)(2)(B)(i) (emphasis added).

Again, Defendants cannot deem a captive arrangement to be abusive based on factors that the Code addresses and resolves differently. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) (courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply [especially] when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest"). Policyholder concentration is central to the concept of captive insurance. In a pure captive arrangement, policyholder concentration is 100%: The captive's parent company is the sole policyholder. As policyholder concentration lowers, a captive begins to resemble a commercial insurer with many unrelated customers. The PATH Act determines where along that continuum an insurance company must fall to qualify for §831(b). Defendants cannot use their rule-making authority under §6707A to alter that choice. *See Jama*, 543 U.S. at 341; *cf. San Francisco v. EPA*, 145 S. Ct. 704, 717 (2025) (rejecting an interpretation that "would undo what Congress plainly sought to achieve" by amending the statute).

### D. Defendants' abuse-detection rationale is pretext.

The final rule is arbitrary and capricious for a fourth reason: Defendants' explanation for imposing the final rule's tests is "pretext" for their long-running efforts to stymie small captives and limit the use of §831(b). *See Dep't of Comm.*, 588 U.S. at 782.

The APA requires agencies to give "genuine justifications" for their actions. *Id.* at 785. Implied in an agency's obligation to "'disclose the basis'" of its decision is that it must disclose the *true* basis, and courts must set aside the decision if the agency's explanation is "pretextual." *Id.* at 780. An explanation is pretextual if it is "incongruent with what the record reveals about the agency's priorities and decisionmaking process" or if there is a "disconnect between the decision made and the explanation given." *Id.* at 785. When examining agency action for pretext, courts are "'not required to exhibit a naiveté from which ordinary citizens are free.'" *Id.*

The history of the final rule shows that Defendants' decision to target small captives was a foregone conclusion—not, as Defendants claim, the product of studying taxpayer examinations and

28

caselaw. The IRS first adopted an anti-captive rule in 1977, which disallowed businesses from deducting captive insurance premiums from their taxable income. *See* Rev. Rul. 77-316. After courts unanimously rejected that theory, *see* Rev. Rul. 2001-31 (revoking Rev. Rul. 77-316); A.R. 4046, the IRS began targeting §831(b) captives through Notice 2016-66. That notice suffered a similar fate: This Court set it aside after finding no "facts or data" in the administrative record justified the IRS's opposition to small captives. *CIC Services II*, 592 F.Supp.3d at 686. The ink was barely dry on this Court's judgment when Defendants started the rulemaking process for the final rule, which imposes virtually identical tests as Notice 2016-66 to once again label small captives as abusive. *See* 88 Fed. Reg. at 21,547.

Defendants' real reason for issuing the final rule is not to detect tax abuse, but to limit the use of §831(b). The 20 Percent Relationship Test, Financing Factor, and Loss Ratio Factor are structured to cover small captives generally, not the few that might abuse §831(b). If the tests were designed to catch abusive captives, one would expect them to resemble the indicators of tax abuse that the IRS's own experts identified. For example, one IRS expert opined that "wild variations in policy limits" year-to-year, when the underlying risk remains constant, can indicate that a captive lacks economic substance. A.R. 22102. Similarly, "very expensive" coverage lines that were "purportedly important" one year but dropped the next could suggest a sham. A.R. 22102-03. Those indicators are just as "objective" and "administrab[le]" as the final rule's tests. 90 Fed. Reg. at 3,535 But rather than adopt a rule that operationalizes the opinions of IRS's experts, the final rule invents three new tests, unsupported by reason, taxpayer examinations, or caselaw, that target features that are typical of captives in general but are deemed abusive only if a captive elects §831(b) tax treatment.

Other aspects of the final rule show that Defendants' true goal is limiting §831(b)'s tax benefits. While captive arrangements large and small must offer genuine insurance to qualify for §162(a)'s tax deduction, the final rule's tests apply only to captives that elect §831(b). 90 Fed. Reg. at 3,539.

Consider also the final rule's "modified computation ratio," which allows §831(b) captives to satisfy the Loss Ratio Factor by issuing a "policyholder dividend." *Id.* at 3,542. The decision of a "closely held, small corporation" like §831(b) captives to issue a dividend turns on a complex array factors, but none bears any relation to whether the corporation accumulated its earnings by providing genuine insurance. *See Byrum*, 408 U.S. at 140. The "disconnect" between the final rule's tests and its stated purpose reveals Defendants' tax abuse rationale is mere pretext for their longstanding mission to limit §831(b)'s tax benefits. *Dep't of Comm.*, 588 U.S. at 785.

IRS officials agreed with that assessment behind closed doors. Commenters raised the concern that the final rule's real purpose was to "chill" small captives from using §831(b). 90 Fed. Reg. at 3,539. Publicly, Defendants disclaimed their intention to "discourage the use of section 831(b)." *Id.* But privately, key IRS personnel suspected that was precisely the reason motivating the agency. In an email regarding Notice 2016-66, the Associate Assistant Counsel expressed "skepticism that this notice will succeed in rooting out useful info" and thought "the real motivation … may be to chill" the use of §831(b). A.R. 12591. An IRS staff attorney echoed that suspicion. A.R. 12590. Defendants' pretextual explanation requires the final rule to be set aside. *Dep't of Comm.*, 588 U.S. at 785.

## III. CIC Services is entitled to a remedy for Defendants' APA violations.

Because the final rule violates the APA, CIC Services is entitled to the relief pleaded in its complaint. The Court should declare the final rule and accompanying regulations unlawful, set them aside, and permanently enjoin Defendants from enforcing them.

### A. The final rule should be vacated.

The APA requires courts to "hold unlawful and set aside" agency action that is beyond statutory authority or is arbitrary and capricious. 5 U.S.C. §706(2); *e.g.*, *Mann Constr. v. United States*, 27 F.4th 1138, 1148 (6th Cir. 2022) (explaining that, because the IRS's action violated the APA, "we must set it aside"); *Kentucky v. EPA*, 123 F.4th 447, 473 (6th Cir. 2024) (explaining that vacatur is "the default" and setting aside the agency's action). This remedy, which is more commonly known as vacatur, leads

to the rule's "absence," *Mann Constr.*, 27 F.4th at 1148—making the rule a legal nullity "in its entirety," *CIC Services II*, 592 F.Supp.3d at 687. "Vacatur operates on the rule itself and prevents the rule's 'application to all who would otherwise be subject to its operation.'" *Tennessee v. Cardona*, 762 F.Supp.3d 615, 627 (E.D. Ky. 2025); *see National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). "[T]here is no binding precedent in *any* circuit holding that the vacatur of administrative action under the APA applies to *only* the parties." *Mann Constr. v. United States*, 651 F.Supp.3d 871, 875-76 (E.D. Mich. 2023), *vacated on other grounds*, 86 F.4th 1159.

Though the federal government disagrees with vacatur as a remedy, it will have to win that argument at the Supreme Court. In this and every other circuit, "[r]eviewing courts certainly have the power to vacate an agency action they find unlawful." *Sierra Club v. EPA*, 60 F.4th 1008, 1021 (6th Cir. 2023). That circuit precedent remains binding today, since the Supreme Court's recent decision banning universal injunctions does not "resolv[e] the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025).

Even under the government's position, moreover, vacatur is allowed to the extent necessary to give the plaintiffs complete relief. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 842 (2024) (Kavanaugh, J., concurring). So this Court should at least vacate the final rule with respect to CIC Services, its clients, and its affiliates. *Cf., e.g.*, *GBX Assocs. v. United States*, 2022 WL 16923886, at *18 (N.D. Ohio Nov. 14, 2022). Because CIC Services is both a material advisor and a participant in §831(b) arrangements within the final rule's scope, vacating the rule for CIC Services' past, present, and prospective clients and affiliates is necessary to afford it complete relief. Narrower relief would not alleviate the injuries that CIC Services suffers from the final rule's reporting requirements for material advisors or the chilling effect that the final rule has on CIC Services' current and future clients. King Decl. ¶19.

**B. The Court should also declare the final rule invalid and enjoin Defendants from enforcing it against CIC, its clients, and its affiliates.**

The APA allows "declaratory judgments or injunctive relief" in addition to vacatur. *Mann Constr. v. United States*, 86 F.4th 1159, 1163 (6th Cir. 2023) (citing 5 U.S.C. §§702, 703). Courts weigh five factors when considering declaratory relief: (1) "whether the judgment would settle the controversy"; (2) whether a declaration "would serve a useful purpose"; (3) whether the remedy is "being used for merely for 'procedural fencing'"; (4) whether a declaration would intrude on state and federal relations; and (5) whether an alternative remedy is "better or more effective." *Univ. of Tennessee Rsch. Found. v. Caelum Biosciences*, 667 F.Supp.3d 734, 753 (E.D. Tenn. 2023). Courts consider four factors when considering a permanent injunction: (1) whether the plaintiff "has suffered an irreparable injury;" (2) whether "remedies available at law, such as monetary damages, are inadequate;" (3) whether "the balance of hardships" favor an injunction; and (4) whether "the public interest would … be disserved." *Tennessee Valley Auth. v. Jones*, 199 F.Supp.3d 1198, 1205 (E.D. Tenn. 2016).

A declaratory judgment is warranted here. Declaring Defendants to have violated the APA by issuing a rule that is unlawful, beyond their statutory authority, and arbitrary and capricious would settle the parties' controversy because it would "finally resolve" the legal status of the final rule. *Owners Ins. v. Lyons Lumber*, 2006 WL 905935, *5 (E.D. Ky. Apr. 7). A declaration would serve a useful purpose because the judgment would reflect the nature of Defendants' APA violation—whether they acted beyond their statutory authority, without sufficient evidence or reasoning, or all three. CIC Services does not seek a declaration for merely procedural reasons, and declaring the final rule invalid would preserve states' rights over insurance. Alternative remedies, like vacatur, are not more effective because the judgment accompanying those other remedies would not specify the nature of Defendants' APA violation, freeing Defendants to issue a new rule that does not address all the Court's reasons for ordering vacatur. *Compare CIC Services II*, 592 F.Supp.3d at 683, 687 (holding Notice 2016-66 invalid for lack of notice-and-comment rulemaking and arbitrary and capricious reasoning), *with* 90 Fed. Reg.

at 3,538 (asserting that the final rule complies with *CIC Services II* because "notice-and-comment procedures have been followed").

A permanent injunction is also warranted. The final rule causes ongoing injuries to CIC Services, its affiliates, and its clients in the form of annual recordkeeping and reporting costs, increased expenses and loss of business value, reputational damage and other intangible harms, and the threat of civil and criminal liability. King Decl. ¶¶11-17; *see CIC Services II*, 592 F. Supp. 3d at 688. Because the APA does not waive the United States' sovereign immunity for monetary damages, no legal remedy can alleviate these injuries. *Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023). The balance-of-harms and public-interest prongs favor an injunction because "neither Defendants nor the public have a legitimate interest in enforcing … unlawful actions." *Madan B.K. v. Noem*, -- F.Supp.3d --, 2025 WL 1171572, *8 (W.D. Mich. Apr. 23). Enjoining the final rule would also serve the public interest by demonstrating that an agency's disregard for its regulatory authority "will not be tolerated." *Tennessee Valley Auth.*, 199 F.Supp.3d at 1206. Accordingly, the Court should enter a permanent injunction barring Defendants from enforcing the final rule against CIC Services and its past, present, and prospective clients and affiliates.

## CONCLUSION

The final rule's many defects are more examples of the IRS's poor "'history of complying with APA procedures.'" *CIC Services II*, 592 F.Supp.3d at 688. This Court should declare the final rule and accompanying regulations unlawful, set them aside, and permanently enjoin Defendants from enforcing them against CIC Services, its clients, and its affiliates.

Dated: August 14, 2025

Respectfully submitted,

Adam R. Webber*
WEBBER LAW GROUP, LLC
4244 Indian Ripple Rd., Ste. 150
Beavercreek, OH 45440
(937) 470-9668

Kenneth A. Lazarus*
LAZARUS & ASSOCIATES
5125 MacArthur Blvd., NW, Ste. 32A
Washington, DC 20016
(202) 295-2330

_/s/ Cameron T. Norris_
Cameron T. Norris (TN Bar No. 33467)
Matt Pociask*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*admitted pro hac vice*

*Counsel for CIC Services*

**CERTIFICATE OF SERVICE**

I e-filed this document with the Court on August 14, 2025, which will automatically email

counsel for all parties.

_/s/ Cameron T. Norris_