UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| CIC SERVICES, LLC, | ) | |
|---|---|---|
| | ) | Case No. 3:25-cv-146 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Jill E. McCook |
| INTERNAL REVENUE SERVICE, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION**

Before the Court are the cross-motions for summary judgment filed by Plaintiff CIC Services, LLC ("CIC") and Defendants the Internal Revenue Service ("IRS"), Melanie Krause, the United States Department of Treasury (the "Treasury Department"), and the United States of America (collectively, the "Government"). (Docs. 21, 24.) For the following reasons, CIC's motion for summary judgment (Doc. 21) will be **DENIED**, and the Government's motion for summary judgment (Doc. 24) will be **GRANTED**.

I. **BACKGROUND**

   A. **Captive and Microcaptive Insurance**

As the Supreme Court of the United States has explained:

A micro-captive transaction is typically an insurance agreement between a parent company and a "captive" insurer under its control. The [United States] Code provides the parties to such an agreement with tax advantages. The insured party can deduct its premium payments as business expenses. *See* [26 U.S.C.] § 162(a). And the insurer can exclude up to $2.2 million of those premiums from its own taxable income, under a tax break for small insurance companies. *See* [26 U.S.C.]

§ 831(b). The result is that the money does not get taxed at all. That much, for better or worse, is a congressional choice. But no tax benefit should accrue if the money is not really for insurance—if the insurance contract is a sham, which the affiliated companies have entered into only to escape tax liability. And according to the IRS, some micro-captive transactions are of that kind.

*CIC Servs., LLC v. Internal Revenue Serv.*, 593 U.S. 209, 213 (2021).

To qualify for these tax benefits under § 831(b), a captive insurer must meet certain requirements. Specifically, it must: (1) not exceed limits on "net written premiums (or, if greater, direct written premiums) for the taxable year"; (2) meet certain diversification requirements; and (3) elect application of § 831(b) for such taxable year. *See* 26 U.S.C. § 831(b)(2). As it relates to the statute's diversification requirements, § 831(b) applies to a captive insurer, if:

> (I) no more than 20 percent of the net written premiums (or, if greater, direct written premiums) of such company for the taxable year is attributable to any one policyholder, or

> (II) such insurance company does not meet the requirement of subclause (I) and no person who holds (directly or indirectly) an interest in such insurance company is a specified holder who holds (directly or indirectly) aggregate interests in such insurance company which constitute a percentage of the entire interests in such insurance company which is more than a de minimis percentage higher than the percentage of interests in the relevant specified assets with respect to such insurance company held (directly or indirectly) by such specified holder.

26 U.S.C. § 831(b)(2)(B)(I)–(II).

### B. Reportable Transactions

Through the Internal Revenue Code, Congress requires that certain taxpayers provide the IRS with information regarding "reportable transaction[s]." 26 U.S.C. § 6707A(c)(1); *see also CIC*, 593 U.S. at 212 ("As every taxpayer knows, the [IRS] has broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes.") Congress defines a "reportable transaction" as "any transaction with respect to which information is required to be included with a return or statement because, as determined under

regulations prescribed under section 6011, such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion." *Id*. Consistent with this requirement, Congress delegated to the Secretary of the Department of Treasury (the "Secretary") the authority to "prescribe regulations which provide . . . such rules as may be necessary to carry out the purposes of this section." 26 U.S.C. § 6111(c)(3). Congress also authorized the IRS to assess penalties to taxpayers and material advisors who fail to make required disclosures regarding reportable transactions. 26 U.S.C. §§ 6707(a), 6708(a). Taxpayers and material advisors who willfully fail to make required disclosures are potentially subject to criminal prosecution. *See* 26 U.S.C. § 7203.

Consistent with the authority delegated by Congress, the Secretary has promulgated regulations specifying that taxpayers and material advisors must provide to the IRS information about defined types of reportable transactions, including, but not limited to:

- "Listed transactions"—"a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service (IRS) has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction";

. . .

- "Transactions of interest"—"a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has identified by notice, regulation, or other form of published guidance as a transaction of interest."

26 C.F.R. § 1.6011-4(b)(1)–(6).

### C. Prior Litigation

Concerned that certain taxpayers were structuring captive insurance companies to claim tax benefits under § 831 without providing real insurance to the parent company, the IRS issued Notice 2016-66, which classified "micro-captive transactions" as "transactions of interest" for the purposes of 26 C.F.R. § 1.6011-4 and 26 U.S.C. §§ 6011 and 6012. Based on this

3

classification, the Notice required certain taxpayers and material advisors to provide information to the IRS in connection with these transactions. CIC is a Knoxville-based firm that helps small businesses form and manage a captive insurance company. In 2017, CIC filed a lawsuit requesting that the Court set aside the Notice and issue an injunction prohibiting enforcement, arguing that issuance of the Notice violated rulemaking requirements under the Administrative Procedures Act ("APA") and that the Notice constituted an arbitrary and capricious rule under the APA. *See CIC Servs., LLC v. Internal Revenue Serv.*, Case No. 1:17-cv-110 (E.D. Tenn.). On March 21, 2022, the Court invalidated Notice 2016-66, finding that the IRS failed to follow notice-and-comment procedures required by the APA and that the Notice was arbitrary and capricious under the APA. *CIC Servs., LLC v. Internal Revenue Serv.*, 592 F. Supp. 3d 677, 688 (E.D. Tenn. 2022).

### D. The IRS's Final Rule and Accompanying Regulations

After the Court invalidated and set aside Notice 2016-66, the IRS proposed new regulations and invited public comment. 88 Fed. Reg. 21547 (Apr. 11, 2023). Ultimately, the IRS issued a final rule (the "Final Rule") and promulgated accompanying regulations. 90 Fed. Reg. 3534 (January 14, 2025). Under the Final Rule, a captive transaction qualifies as a "listed transaction" if it elects § 831(b) taxation and fails three tests, which the Final Rule refers to as the "20 Percent Relationship Test," the "Financing Factor," and the "Loss Ratio Factor." 90 Fed. Reg. at 3534–35; *see also* 26 C.F.R. § 16011–10. A captive fails the "20 Percent Relationship Test" if "[a]t least 20 percent of the entity's assets or the voting power or value of its outstanding stock or equity interests is directly or indirectly owned, individually or collectively, by an Insured, an Owner, or persons Related to an Insured or an Owner." 26 C.F.R. § 1.6011–10(b)(1)(iii). A captive fails the "Financing Factor" requirement if the captive "made available

as financing or otherwise conveyed . . . to" a policyholder, a policyholder's owners, or related entities "in a transaction that did not result in taxable income or gain" "any portion of the amounts" the captive earned from insurance contracts. *Id*. at § 1.6011–10(c)(1)(i). Finally, a captive fails the "Loss Ratio Factor" if the "amount of liabilities incurred for insured losses and claim administration expenses" is "less than 30 percent of" the "amount equal to premiums earned" by the captive minus policyholder dividends, during the relevant period. *Id*. at § 1.6011-10(c)(2)(i)–(ii). Additionally, the regulations also designate captive transactions as transactions of interest if the captive elects § 831 tax treatment, fails the 20 Percent Relationship Test, and fails either the Financing Factor or Loss Ratio Factor with an adjusted loss ratio of 60 percent. 90 Fed. Reg. at 3541; *see* 26 C.F.R. § 1.6011-11(c), (e)(1). Under the regulations, a taxpayer that engages in listed transactions or transactions of interest must file reports with the IRS describing their transactions and the parties involved. 26 C.F.R. § 1.6011-10(g); *id*. at § 1.6011-11(g); *id*. at § 1.6011-4(d).

### E. The Present Action

In this action, CIC argues that, like the prior Notice, the IRS's Final Rule and accompanying regulations regarding captive insurance transactions run afoul of the APA. In support of its position, Sean King, CIC's Principal and co-founder, avers that CIC helps clients form and manage a captive insurance company and that many of CIC's clients qualify for tax incentives under § 831(b). (Doc. 21-1, at 1.) Additionally, King avers that, because CIC's clients operate captives that the Final Rule designates as listed transactions or transactions of interest, it has contractual obligation to help these clients with IRS recordkeeping and reporting requirements. (*Id*. at 1–2.) Finally, King avers that the Final Rule also imposes recordkeeping and reporting requirements on "material advisors," like CIC, which impose significant costs on

CIC, including out-of-pocket expenses, diverted resources, increased liability premiums, reduction its market value, loss of clients, reputational damage, and the threat of civil and criminal liability. (*Id.* at 3–4.)

CIC initiated this action on April 9, 2025, asserting that the IRS's Final Rule and accompanying regulations must be set aside because they violate the APA as contrary to law and arbitrary and capricious agency action. (*See* Doc. 1, at 13–22.) Based on its allegations, CIC requests that the Court: (1) declare that the Final Rule and accompanying regulations violate the APA; (2) order that the Final Rule and accompanying regulations be set aside; and (3) enter a permanent injunction prohibiting the Government from enforcing the Final Rule and accompanying regulations "against [CIC], its clients, and its affiliates." (*Id.* at 22–23.) CIC and the Government have filed cross-motions for summary judgment, and these motions are ripe for the Court's review.

## II. STANDARD OF LAW

In cases challenging whether an administrative agency complied with the requirements of the APA, the normal summary-judgment standard set forth in Rule 56(a) of the Federal Rules of Civil Procedure does not apply. *Coe v. McHugh*, 968 F. Supp. 2d 237, 239 (D.D.C. 2013); *Oak Ridge Env't Peace All. v. Perry*, 412 F. Supp. 3d 786, 808 (E.D. Tenn. 2019). Rather, the Court's role is limited to reviewing the administrative record to determine whether the agency complied with the requirements of the APA. *Coe*, 968 F. Supp. 2d at 239 ("Summary judgment thus serves as the mechanism for deciding as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."). In making this determination, "the agency resolves factual issues to arrive at a decision that should be supported by the administrative record." *Oak Ridge*, 412 F. Supp. 3d at

808 (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007))."

The Court must "determine whether or not the evidence in the [administrative] record permitted the agency to make the decision it did[.]" *Id*. The APA directs that a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A), (C).

   III. ANALYSIS

      A. Scope of Statutory Authority

CIC first argues that the Court should set aside the Final Rule and accompanying regulations because the Treasury Department and the IRS have exceeded their statutory authority by imposing new requirements to obtain § 831 tax benefits. Specifically, CIC argues that a captive that meets § 831's requirements but does not pass the Final Rule's tests may lose congressionally approved § 831 tax benefits. (*See* Doc. 21, at 21–25.)

The APA empowers courts to set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 707 (6th Cir. 2025) (quoting 5 U.S.C. § 706(2)(C)). In evaluating an agency's actions, Courts determine the scope of an agency's statutory authority without deferring to the agency's interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.") When the authorizing statute includes an express delegation of discretionary authority, a court's role is to ensure "the agency has engaged in reasoned decisionmaking" within the boundaries of its delegated authority. *Id*. at 395 (citation modified).

In this case, the IRS has not exceeded its statutory authority because the Final Rule and its accompanying regulations do not threaten the tax benefits available to a captive that meets § 831(b)'s requirements. The Final Rule and accompanying regulations provide tests defining certain captive transactions as "Listed Transactions" and "Transactions of Interest," triggering reporting requirements. 90 Fed. Reg. at 3534–35; *see also* 26 C.F.R. § 16011–10. CIC is correct that the Final Rule's tests to determine whether a captive transaction qualifies as Listed Transaction or a Transaction of Interest include considerations and requirements not found in § 831(b). CIC's argument that the IRS has exceeded its statutory authority fails, however, because nothing in the Final Rule or its accompanying regulations provide that a qualifying captive taxpayer will lose § 831(b) tax benefits in the event the IRS determines that the captive engaged in Listed Transactions or Transactions of Interest. To the contrary, the Final Rule and its accompanying regulations specify that captives who engage in Listed Transactions or Transactions of Interest are subject to recordkeeping and reporting requirements. Indeed, the Final Rule expressly provides that "[t]axpayers remain free to engage in any captive transaction, regardless of whether such action is identified in § 1.6011.10 or § 1.6011-1" and that the Treasury Department and the IRS "do not intend to discourage the use of section 831(b) by entities that qualify for the election, nor should these regulations be construed as intending to discourage the use of section 831(b) by such entities." 90 Fed. Reg. at 3538, 3540. As a result, a captive can qualify for and maintain access to § 831(b) tax benefits by meeting the congressionally mandated statutory requirements and, at the same time, be subject to recordkeeping and reporting requirements under the Final Rule based on tests and requirements that exceed the requirements set forth in § 831. As the Supreme Court has recognized, "the [IRS] has broad power to require the submission of tax-related information that it believes

helpful in assessing and collecting taxes." *CIC*, 593 U.S. at 212 (noting that "the Code delegates to the Secretary of the Treasury, acting through the IRS, the task of identifying particular transactions with the requisite risk of tax abuse"). In fact, Congress mandates that the IRS collect information and identify transactions that have the potential for tax abuse. *See* 26 U.S.C. § 6011 ("[w]hen required by regulations prescribed by the Secretary any person made liable for any tax imposed by this title, or with respect to the collection thereof, shall make a return or statement according to the forms and regulations prescribed by the Secretary."); 26 U.S.C. § 6707A (defining "reportable transaction" as "any transaction with respect to which information is required to be included with a return or statement because, as determined under regulations prescribed under section 6011, such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion" and "listed transaction" as a reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011"). Consistent with these statutes, the Final Rule and accompanying regulations create disclosure requirements, not substantive rules affecting how the IRS will assess taxes. Accordingly, the Treasury Department and the IRS have not exceeded their statutory authority by promulgating the Final Rule and accompanying regulations.

### B. Arbitrary and Capricious

CIC next argues that the Court should invalidate the Final Rule and accompanying regulations because they are arbitrary and capricious. (Doc. 21, at 25–41.) Specifically, CIC argues that: (1) the administrative record lacks facts or data to support the Final Rule's conclusions; (2) the Final Rule is not reasonably explained; (3) the Final Rule relies on

9
Case 3:25-cv-00146-TRM-JEM   Document 46   Filed 03/05/26   Page 9 of 20   PageID #: 21420

impermissible factors; and (4) the Treasury Department and the IRS's abuse-detection rationale is pretext for eliminating small captives' ability to claim § 831(b) tax benefits. (*Id.*)

A court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In determining whether an agency action is arbitrary and capricious under the APA, courts "determine only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see also Atrium Med. Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 766 F.3d 560, 567 (6th Cir. 2014) (noting that an agency's decreed result must be within the scope of its lawful authority and that "the process by which it reaches that result must be logical and rational."). A court "may not substitute [its] judgment for that of the [agency], but instead must confine [itself] to ensuring that [the agency] remained 'within the bounds of reasoned decisionmaking.'" *Dep't of Com.*, 588 U.S. at 773 (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983)); *see also Dayton Power & Light Co v. Fed. Energy Reg. Comm'n*, 126 F.4th 1107, at 1120–21 (6th Cir. 2025) (noting that the Court must examine whether the agency considered "relevant factors" and must determine whether the agency engaged in "reasoned decisionmaking" or made "a clear error of judgment"). In reviewing the agency action, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com.*, 588 U.S. at 780. Courts then examine the administrative record to determine if the agency

> has relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation that

> runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Atrium Med. Ctr.*, 766 F.3d at 567 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). The standard of review is "narrow," and the reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id*. The agency's reasoning, however, must be "discernable and defensible." *Id*. at 568.

### i. Sufficient Facts and Data

CIC first argues that the Final Rule and accompanying regulations are arbitrary and capricious because the administrative record does not contain sufficient facts and data to support the conclusion that small captive transactions are potentially utilized to escape tax liability. (Doc. 21, at 26–28.)

In this case, and unlike in the Prior Litigation, the administrative record includes recent multiple tax court decisions in which courts determined that a taxpayer in a micro-captive transaction remitted amounts treated as insurance premiums for something other than insurance. *See e.g.*, *Avrahami v. Comm'r of Internal Revenue*, 149 T.C. 144, 197–98 (2017) (Doc. 32-1, at 31–67) (finding that a microcaptive did not provide insurance because it failed to distribute risk and did not act as an insurer typically would act); *Syzygy Ins. Co. v. Comm'r of Internal Revenue*, T.C. Memo. 2019-34 (Apr. 10, 2019) (Doc. 32-1, at 854–875) (same); *Caylor Land & Dev. v. Comm'r of Internal Rev.*, T.C. Memo. 2021-30 (Mar. 10, 2021) (Doc. 32-1, at 111–63) (finding that a microcaptive failed to distribute risk and did not sell insurance in the commonly accepted sense); *Keating v. Comm'r of Internal Revenue*, T.C. Memo. 2024-2 (Jan. 4, 2024) (Doc. 32-1, at 405–51) (finding that taxpayers failed to meet their burden of proving payments to a captive insurer were for insurance in the commonly accepted sense); *Swift v. Comm'r of Internal Revenue*, T.C. Memo. 2024-13 (Feb. 1, 2024) (Doc. 32-1, at 823–54) (explaining that,

although the captives displayed some attributes of insurance companies, "they failed to operate as insurance companies and their premiums were nonsense"); *Patel v. Comm'r of Internal Revenue*, T.C. Memo. 2024-34 (Mar. 26, 2024) (Doc. 32-1, at 555–90) (finding that taxpayers failed to meet their burden of proving payments to a captive insurer were for insurance in the commonly accepted sense); *Royalty Mgmt. Ins. Co. v. Comm'r of Internal Revenue*, T.C. Memo. 2024-87 (Sept. 16, 2024) (Doc. 32-1, at 736–68) (finding that payments to a captive insurance company did not constitute insurance premiums and that the captive was not an insurance company). Such decisions provide the "facts and data" necessary for the Treasury Department and the IRS to conclude that captive insurance arrangements are potentially used for tax avoidance. These decisions also provide a legitimate basis for the Treasury Department and the IRS to seek additional information from captives and material advisors to aid in determining whether a captive is, in fact, impermissibly avoiding tax liability. Accordingly, the administrative record in this case includes sufficient facts and data to support the Treasury Department and the IRS's conclusion that captive transactions can be utilized to escape tax liability, and, thus, a sufficient basis to support its promulgation of the Final Rule and accompanying regulations.

### ii. *Reasonable Explanation*

CIC next argues that the Final Rule and accompanying regulations are arbitrary and capricious because the Treasury Department and the IRS have not reasonably explained how it reached its conclusions regarding captive insurance arrangements. (Doc. 21, at 28–33.) Stated another way, CIC contends that the Treasury Department and the IRS have failed to adequately explain—and the administrative record fails to reflect—how stated criteria for triggering

12

Case 3:25-cv-00146-TRM-JEM  Document 46  Filed 03/05/26  Page 12 of 20
PageID #: 21423

reporting requirements under the Final Rule reasonably capture information about arrangements in which premiums are not really for insurance.

Under the APA, the Court must review the administrative record "to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence, to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Trenton Threatened Skies, Inc v. Fed. Aviation Admin.*, 90 F.4th 122, 130–31 (3d Cir. 2024) (quoting *Sw. Pa. Growth All. v. Browner*, 121 F.3d 106, 117 (3d Cir. 1997)); *see also Sierra Club v. United States Env't Prot. Agency*, 161 F.4th 934, 942 (6th Cir. 2025). Additionally, in considering whether the agency has provided a reasonable explanation, the Court "may not vacate an agency's decision unless the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is [highly] implausible[.]'" *Sierra Club*, 161 F.4th at 942 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

In this case, the Treasury Department and the IRS have provided a reasonable explanation for the Final Rule and accompanying regulations. Recent tax court decisions included in the administrative record explain how captive insurance arrangements can be used for tax avoidance. For example, in *Swift*, after acknowledging that § 831(b) provides an "alternative taxing structure for certain small insurance companies," the tax court explained that "[t]o make a valid section 831(b) election, a captive must be an insurance company." T.C. Memo 2024-13, at *15 (Doc. 32-1, at 838–39). The tax court has further explained "while insurance is deductible, amounts set aside in loss reserve as a form of self-insurance are not."

*Caylor Land & Dev.*, T.C. Memo. 2021-30, at 31 (Doc. 32-1, at 141). To aid in differentiating between permissible insurance and impermissible self-insurance, the tax court has identified "four nonexclusive but rarely supplemented criteria: [1] risk-shifting; [2] risk-distribution; [3] insurance risk; and [4] whether an arrangement looks like commonly accepted notions of insurance." *Id* at 32. Considering these factors, when the tax court determines that specific arrangements are not actually contracts for insurance and that a captive does not fall within the meaning of insurance company as defined in section 831(c), it concludes that the captives are ineligible to use section 831(b). *See id*.

Similarly seeking to differentiate between acceptable captive arrangements for insurance and captive arrangements that are for tax avoidance, and relying on these recent tax court decisions, the Treasury Department and the IRS issued the Final Rule and accompanying regulations. In explaining the basis for the Final Rule and accompanying regulations, the Final Rule states: "[t]he transactions described in § 1.6011-11 have many of the characteristics of self-insurance, and as such, taxpayers who deduct amounts paid to captives in such transactions may be engaged, as a matter of substance, in self-insurance, but more information is needed to determine if that is the case." 90 Fed. Reg. at 3539. To that end, the Final Rule and accompanying regulations trigger reporting requirements based on objective factors which the Treasury Department and IRS contend are sufficiently predictive proxies for tax-avoidant transactions. *See id*. at 3538 (noting that "the factors are objective and reasonably determined, based on relevant factors in existing statutory provisions, on available industry data, and on a careful review of case law and examination information"). The Final Rule then explains the Treasury Department and the IRS's rationale for inclusion of each of these factors.

1. The Loss Ratio Factor

The loss ratio factor "measures whether the amount of liabilities incurred for insured losses and claims administration expenses is significantly less than the amount of premiums earned, adjusted for policyholder dividends" over the course of a ten-year computation period for listed transactions, *see* 26 C.F.R. § 1.6011-10(b)(2)(ii), or an up-to-ten-year computation period for transactions of interest, *see* 26 C.F.R. § 1.6011-10(b)(2)(ii). 90 Fed. Reg. at 3540. As explained in the text of the Final Rule, "[s]everal commentors suggested that the Loss Ratio Factors . . . are inappropriate metrics for the captive insurance industry and should not be determinative of whether a transaction is a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest." 90 Fed. Reg. at 3540. The IRS responded to these comments explaining how the Loss Ratio Factor identifies circumstances in which premiums are excessively priced relative to "artificially low or nonexistent claims activity." More specifically, the Final Rule explains:

> The Loss Ratio Factor measures whether the amount of liabilities incurred for insured losses and claims administration expenses is significantly less than the amount of premiums earned, adjusted for policyholder dividends. The primary purpose of premium pricing is to ensure funds are available should a claim arise. The pricing of premiums should naturally reflect the economic reality of insurance operations, to ensure that policies are "price[d] in such a way that the premiums brought in cover losses and the insurer's business expenses with enough profit left over to keep investors happy." *Avrahami*, 149 T.C. at 152. . . . Pricing premiums far in excess of what is reasonably needed to fund insurance operations results in a lower loss ratio and remains a strong indicator of tax avoidance. Further, while amounts paid for insurance may be deductible business expenses, amounts set aside in a loss reserve as a form of self-insurance are not.

90 Fed. Reg. at 3540. Stated another way, the loss ratio factor attempts to identify situations in which a captive arrangement may not be functioning like insurance in the commonly accepted sense. Such a rationale follows a reasonably discernable path considering the tax court decisions included in the administrative record and remains a valid explanation for agency action even if

15
Case 3:25-cv-00146-TRM-JEM    Document 46    Filed 03/05/26    Page 15 of 20
PageID #: 21426

the tax court does not routinely rely on the loss ratio factor in making its determinations regarding whether particular captive transactions are for insurance.[1]

## 2. The Financing Factor

The Final Rule and accompanying regulations also trigger reporting requirements if the captive "made available as financing or otherwise conveyed . . . to" a policyholder, a policyholder's owners, or related entities "in a transaction that did not result in taxable income or gain" "any portion of the amounts" the captive earned from insurance contracts. 26 C.F.R. at § 1.6011–10(c)(1)(i). In the Final Rule, the Treasury Department and the IRS explained why they consider certain financing arrangements as potentially indicative of tax avoidance:

> In an abusive micro-captive transaction, an Insured entity deducts amounts paid directly or indirectly to the Captive that the parties treat as insurance premiums in an arrangement that does not constitute insurance for Federal tax purposes. Captives then exclude those amounts from taxable income under section 831(b). When a financing arrangement is involved, such Captives return some portion of those tax-deferred amounts directly or indirectly to the Insured or related parties via a loan, capital contributions to a special purpose vehicle, or other financing arrangement for which a current tax does not apply. Thus, in a financing arrangement involving an abusive micro-captive transaction, amounts paid as premiums have not only avoided ordinary taxation but have continued to avoid tax while back in the hands of the related parties who caused the premiums to be paid and deducted.

90 Fed. Reg. at 3546. In support of this explanation, the Treasury Department and IRS cited to tax court cases in which premiums paid to a captive insurer were made available as loans to related entities. *See id*. (citing *Avrahami*, T.C. 149 at 169-71; *Swift*, T.C. Memo. 2024-13, at *18-19; *Patel*, T.C. Memo. 2024-34, at *11). And, although the Treasury Department and IRS

---

[1] The administrative record includes one tax court case in which it analyzed an entity's loss ratio and determined that a cumulative loss ratio varying from between twenty-eight percent and thirty-four percent was sufficient to conclude that the "level or risk transferred" was "more than sufficient to treat them as 'insurance contracts' for Federal income tax purposes. *See R.V.I. Guar. Co. & Subsidiaries v. Comm'r of Internal Revenue*, 145 T.C. 209, 228 (2015). The entity at issue in this case, however, was not a "captive" insurance company.

concede that the "presence of related-party financing in a micro-captive transaction by itself may not rise to the level of tax avoidance," they have attempted to balance that consideration by requiring the presence of both the Financing Factor and Loss Ratio Factor to trigger recordkeeping and reporting obligations. *Id*. Especially when considered in conjunction with the Loss Ratio Factor, the Financing Factor identifies circumstances in which a captive arrangement may not be functioning like insurance in the commonly accepted sense. As a result, the Treasury Department and the IRS have provided a reasonably discernable path as it relates to their inclusion of the Financing Factor in the Final Rule and accompanying regulations.

3. The 20 Percent Relationship Test

Finally, the Final Rule and accompanying regulations provide that the reporting requirements are triggered only if at least twenty percent of a captive's assets or equity is owned by an insured. 26 C.F.R. § 1.6011-10(b)(1)(iii); 26 C.F.R. § 1.6011-11(b)(1). The Final Rule explains that the purpose of this rule is to exclude captive arrangements with less potential for tax avoidance, such as small mutual insurers with diversified ownership. 90 Fed. Reg. at 3555. Such a rule provides a limitation on arrangements subject to reporting requirements, and the Treasury Department and IRS have provided a reasonable explanation for inclusion of such a limitation in the Final Rule and accompanying regulations.

Ultimately, even if the foregoing factors are overinclusive and trigger reporting requirements for captive transactions that are legitimately for insurance, that consideration does render the Final Rule and accompanying regulations arbitrary and capricious, because the Treasury Department and the IRS have explained how these factors aid in identifying potentially tax-avoidant transactions. *United States Sportsmen's All. Found. v. Centers for Disease Control & Prevention*, No. 25-1473, 2026 WL 412318, at *6, __ F.4th __ (6th Cir. Feb. 13, 2026) ("That

an agency regulation might be over- or under-inclusive does not necessarily render it arbitrary and capricious.") Moreover, even if CIC is correct that these factors are poor proxies for determining whether an arrangement is for tax avoidance, the Sixth Circuit has explained, "[t]he fact that the regulations might not be truly necessary or effective does not make the regulations arbitrary or capricious." *Id*. The Treasury Department and IRS have reasonably explained how the factors in the Final Rule and accompanying regulations may correlate with tax avoidance avoidant arrangements. Further, and as explained above, the Final Rule does not disallow or curtail any entity's ability to claim § 831(b) tax benefits; rather, it triggers reporting requirements that may allow the Treasury Department and IRS to more accurately identify whether certain arrangements are "for insurance."[2] Under these circumstances, the Treasury Department and the IRS have reasonably explained the rationale for the Final Rule and accompanying regulations.

### iii. Pretext

Finally, CIC argues that the Final Rule is arbitrary and capricious because it is pretext for the Treasury Department and the IRS's long-running efforts to limit captives' use of § 831(b) tax

---

[2] For this same reason, CIC is incorrect in arguing that the Final Rule and accompanying regulations are premised on "impermissible factors." (Doc. 21, at 34–36.) As explained in the underlying tax court decisions, to qualify for § 831(b) election, a captive must be an "insurance company," and, when a captive enters contracts that are not actually "for insurance," the captive may not be an "insurance company" as that term is defined in § 831(c). As a result, on a superficial level, a captive may appear to qualify for a § 831(b) election, but, upon additional inquiry, may have entered contracts that are not actually "for insurance" with an "insurance company," such that election under § 831(b) is inappropriate. By CIC's logic, once a captive suggests that it is compliance with § 831(b), any rule seeking information to aid in differentiating between permissible captive arrangements and purely tax-avoidant transactions would be arbitrary and capricious under the APA. Seeking information to aid in weeding out tax-avoidant transactions is not the same as precluding an entity from making a valid code-compliant tax election, especially when nothing in the Final Rule or accompanying regulations prevents an entity from making a § 831(b) election. As a result, the Final Rule and accompanying regulations do not rely on impermissible factors such that they are arbitrary and capricious under the APA.

benefits.  (Doc. 21, at 36–38.)  The administrative record is clear that the Treasury Department and the IRS have been concerned about captives being used for tax avoidant purposes since 2015, when the IRS identified captives in its "Dirty Dozen" list of tax scams, and certainly since 2016, when the IRS issued Notice 2016-66.  *See, e.g.*, *Avrahami*, 149 T.C. at 173 (Doc. 32-1, at 49).  These actions, however, do not demonstrate that the Final Rule in this case is pretext for dissuading small captives from using § 831(b) tax benefits.  The Treasury Department and the IRS have identified circumstances for potential tax abuse and has issued a Final Rule triggering reporting requirements aimed at differentiating legitimate use of small captives from illegitimate tax-avoidant transactions.  Although IRS attorneys expressed skepticism about whether a draft notice designating captive insurance transactions as transactions of interest in 2014 had the potential to "chill" the use of § 831(b) (Doc. 40-2, at 84–88 ), it does not follow that the Final Rule issued in 2025 is pretext for discouraging small captives from using § 831(b).  Limited internal skepticism about the effects of a proposed policy decision and its underlying motivations are simply insufficient to demonstrate that the eventual policy decision is pretext for discouraging code-compliant election of § 831(b) tax benefits, especially considering the tax court decisions in the administrative record suggesting that captives are exploiting these arrangements to avoid taxes.  Moreover, commentors to the proposed rule specifically raised the issue that the proposed regulations "will impermissibly chill the captive insurance industry," especially for small and mid-sized businesses.  90 Fed. Reg. at 3539.  The Treasury Department and the IRS responded to this concern stating:  "The Treasury Department and the IRS do not intend to discourage the use of section 831(b) by entities that qualify for the election, nor should these regulations be construed as intending to discourage the use of section 831(b) by such entities."  *Id*.  CIC may believe that the Treasury Department and IRS have ulterior motives, but

19

the administrative record reflects that Final Rule and accompanying regulations are a result of reasoned decision making and a longstanding concern that captive transactions may be used for tax avoidance are insufficient to demonstrate that the Final Rule is pretext for discouraging legitimate captives from using § 831(b).

* * *

The Treasury Department and the IRS are only required to provide a "reasonably discerned" path for its decision from the administrative record. *Atrium Med. Ctr.*, 766 F.3d at 567 (explaining that an agency's explanation can be "less than ideal"). They have satisfied that obligation. As a result, the Final Rule and accompanying regulations do not constitute arbitrary and capricious agency action. Accordingly, the Court will deny CIC's motion for summary judgment and grant the Government's motion for summary judgment.

IV. **CONCLUSION**

For the reasons stated herein, CIC's motion for summary judgment (Doc. 21) is **DENIED**, and the Government's motion for summary judgment (Doc. 24) is **GRANTED**.

**AN APPROPRIATE JUDGMENT WILL ENTER**.

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**